GAINES v. BARD.

Opinion delivered May 13, 1893.

1. *Master and servant—Attendants at bath-house.*

   Attendants at a public bath-house, who are selected by the manager of the bath-house and enjoy the exclusive privilege of administering baths and taking fees therefor, who not only assist the bathers but perform other services in furtherance of the business enterprise, and who are subject to the manager's general control and to dismissal by him for cause, are

servants of the proprietors of the bath-house, notwithstanding they receive no compensation for their services except as it comes to them in fees paid by the bathers who may choose their attendants from those selected by the manager, pay the fees directly to them and direct the manner of administering the baths.

2.  *Negligence of servant—Injury to bather.*

Where an attendant at a bath-house is given permission to retire after placing a bather in a hot bath, on condition that he respond promptly to call, and neglects to so respond to the bather's call for assistance, whereby the bather is burned, his employer will be liable to the bather for any injury resulting from such negligence.

3.  *Instructions should not be abstract.*

The court should not instruct the jury upon a theory of the case that is not supported by evidence.

Appeal from Garland Circuit Court.

ALEXANDER M. DUFFIE, Judge.

Bard recovered judgment against Gaines and another, proprietors in part of the "Old Hale Bath House," a public bath-house in the city of Hot Springs, for injury from a burn which he claimed to have received, through the negligence of defendant's servant, while taking a vapor bath. The defenses to the action were that the injury was occasioned by plaintiff's negligence; that the servant was not guilty of negligence; but that if he was negligent, he was not defendants', but plaintiff's, servant.

Plaintiff testified as follows: "I came here in April, 1891, to take the hot baths and also medical treatment for my disease, paralysis of the legs, with which I have suffered twenty-four years. I employed Dr. C. S. Reid as my physician, and he prescribed for me to take my baths at the Old Hale Bath House, which was owned by the defendants and others. I went there and bought a ticket from Williams, the clerk and superintendent, for $7, of which I understood $4 was for the ticket and $3 for the attendant. He wrote

the name "John" on the face of the ticket, and told me
that John Martin, who was standing near by, would
show me the bath and attend to me. I followed this .
John into the back part of the building where the hot
rooms were, and he prepared the hot water bath in one
of them, and I bathed there. I took one of the twenty-
one baths, for which the ticket called, daily. When I
would come for a bath, Williams would take my ticket,
punch it and give me a single bath ticket with the name
John written on it, and I would take it back in the bath-
ing department to John, and he would prepare the bath
for me. My physician told me to take the baths at a
temperature of 96 degrees, and I so instructed John. I
could not well get in and out of the bath alone, and
John would assist me. When this ticket was used
up, I bought another at the same price from Williams,
and he wrote the name John across the face of it. I con-
tinued to bathe on in the same way until in June, when I
told Dr. Reid I was not perspiring enough, and he told
me to take the vapor. After I had taken two or three
full vapor baths I told him I could not stand it, and he
told me to take knee or leg vapors merely, which I com-
menced doing. These were taken by sitting outside the
vapor box and putting my legs through an oblong hole
into the vapor box, with towels wrapped about the knees
to prevent the escape of the vapor. I took about ten baths
in this way."

"On the 23d of June he put my legs into the
vapor, wrapped the towels about them, and, leaving,
said he would be back soon and if I needed him to call,
and I told him he could go and I would call when I needed
him. Immediately after he was gone I felt something
burning my leg on the top, between the knee and ankle,
and I moved it about to get it out of the way, but it con-
tinued to burn. I commenced trying to take it out of
the vapor and called John, telling him to come on, that I

was burning up. He said all right, and I think I heard him laugh. He did not come until I had got my legs out, which took me about five minutes; they were in the vapor about five minutes. I told him to go and put some cold water into the bath tub, that my leg was burned. He did so, and I got into it and commenced rubbing my legs, and the skin from the burn commenced rising to the top. I got out, went to my room and sent for Dr. Reid. He gave me some salve, which would ease it for a while. I suffered a great deal from it, night and day; was confined to my room two or three months and unable to earn anything. I was paying $4 a week for board, which before the burn I was able to earn by selling books. The hole was oblong, and just large enough to receive both legs. I have thought over this matter a good deal, and have never been able to tell how I got burned in there. I looked in, but it was so dark that I could see nothing. The burn was about six inches long and about half way between the knee and ankle. John always opened the vapor bath for me and helped me to put my legs into it, and when I wanted to get out I would call him. I was never burnt in the vapor before. I always bathed in this same vapor. My legs had been in it for about a minute before I felt the burning sensation. I usually took knee vapors for from three to five minutes. I neither employed nor paid John Martin. Williams pointed to him and said, 'There will be your attendant.'" (The plaintiff then bared his leg and pointed out as the scar from the injury a somewhat pinkish place on the front of the leg about six inches in length and from one to two inches in breadth, covered with smooth skin, in which there was no depression).

Musick testified: "I was clerk and manager of the Old Hale Bath House from the 16th of January to the 16th of March, 1891, and sold the tickets. The price of bath tickets and the fee of attendants were regulated by

the Secretary of the Interior.   The price of a bath ticket
for twenty-one baths was $4, and the fee of an attendant
$3.   A bathing attendant was allowed to charge 15 cents
a bath, or $3 for twenty-one baths, and the highest price
a bath-house was allowed to charge was 35 cents a bath.
The bath-house proprietors had nothing to do with the
fee of the bathing attendant, but sometimes the bather
would pay it to the manager, and let him pay it to the
attendant, and when he would express such a desire I
would take it.   If the purchaser wanted an attendant
but asked for no particular one, the manager would
assign one.   The bathing attendants were selected by
the manager of the bath-house, and no one was allowed
there as attendant except by arrangement with the
owner or manager.

"Persons desiring to be bathing attendants would
apply for positions as such.   They did this for the pur-
pose of having opportunities of being employed as at-
tendants by those who came there to bathe.   When
one would apply for permission to enter the bath-house
to seek employment from bathers, he was permitted to
do so if there was a vacancy and he was competent and
careful; otherwise not.   Neither the owner nor magager
had anything to do with the directions as to the tem-
perature, kind or duration of baths to be taken, in any
case.   Directions for all this were given the bather by
his physician.   The temperature of the vapor baths was
fixed by the bath-house, and was stationary, except as
it changed from natural causes.   If the bather did not
wish an attendant, he could bathe without one, and in
that case he would be shown where to go for his bath.
While the attendant was serving a bather, he was under
his direction, and not under that of the manager or pro-
prietor.   The manager stays in the front part of the
house where the office is kept and the tickets sold, and
if he were to call any attendant who was busy, he could

not be heard by him. The proprietors paid the attendants nothing, but they kept fires in the stoves in the halls, and kept the rooms, in which they bathed those who employed them, clean."

Bonner testified: "I am a plumber and gasfitter. I have overhauled the plumbing of the Old Hale Bath House several times, and have done work there during the present year. I know how the vapors are arranged. Under the rear of the bath-house there is a ditch walled up with brick, through which hot water runs all the time, and on the top of the inner wall of this ditch is a pipe three inches in diameter, through which hot water runs; and there were three or four vapor rooms or boxes about two and a half or three feet square, under each of which there is let into the 3-inch pipe, at right angles, a 1-4-inch pipe one or two feet long, extending out under the vapor room, where its end was turned upward for two or three inches, and finished off with a gas tip of which the opening was pressed together, so as to make a flat stream, separate the water and cause it to vaporize more readily. This tip is directly under the seat of the vapor room, so that the particles of water thrown upward from it strike the seat and fall back. The seat is about a foot wide and extends clear across the vapor box, to one side of which it is firmly fixed. From the dampness it swells, and if you wished to get it out you would have to use a hammer. The water from the spray could not get above the seat. In the side of the box to which the seat was fixed, and about twelve inches above it, were cut two circular holes close together, through which those desiring to take knee baths could insert their legs into the vapor room and rest them on the seat. All the knee baths I ever saw were arranged in this way. The floors were of wooden slats. The vapor baths were all of the same temperature. You could not control, increase or diminish their

heat, except by a valve on the outside of the building; and the only control was to shut it off altogether, or let it run full."

Washington testified that when the weather was cold or the wind blowing the vapors were not so hot as at other times, and that the bathers complained of the vapors being too cold. He further testified: I was an attendant at the Old Hale Bath House. I applied to the manager and was let in. I wanted to get in so that I could make money from the bathers. The bath-house paid the attendants nothing; we were paid by the bathers; but the bather sometimes paid the attendant's fee to the clerk or manager, and then he would pay it to the attendant. We received no directions for bathing any bather except from himself; we followed his directions. They all took the baths in the way that suited them. We kept fires in the hall and kept the rooms clean for the privilege of remaining there.

John Martin, the attendant, testified: "The seat in the vapor bath was about a foot and a half above the floor, and when the plaintiff was taking a knee bath his feet rested on it. I did not place his legs through the holes into the vapor the day he claims to have been burnt; he did that himself. He could put them through the holes and take them out without aid. He had an involuntary evacuation at the vapor, and this caused him to take his legs out. The first I knew of it was when I saw him coming from the vapor bath, and he told me of it. I gave him a towel and told him to go into the room where the tub was and cleanse himself, and that I would be in directly and fix a bath for him. He went into the bath room and turned in the hot water without any cold water to temper it. Directly I heard him call, and at once went to him, and helped him out of the tub. When I got to him he was on his knees in the tub, and the hot water was rising up from the

bottom where he had turned it in, and he said he was burning. He did not call me while he was in the vapor. There was no way for the hot water to get above the slat floor in the vapor box, and there was no iron or anything in there to burn him. The vapor box was not hot enough to burn or scald. There was no pipe in the bath box. The ¼-inch pipe where the spray was had been broken off from the main pipe, and I had put a coal shovel under the opening where it had entered the 3-inch pipe, to run the water from it under the vapor box and make it help to heat it. It did not throw any water up to the slats or into the vaper box. I examined the vapor box on the 23d, after the plaintiff bathed there, and it was all right, and the seat was in place and tight. Others bathed in it the same day, after I had cleansed it. The plaintiff had had an involuntary evacuation once before, at the bath tub. He paid me for bathing him ; paid me twice, $3 each time."

The assignments of error are stated in the opinion.

*G. G. Latta* and *Martin & Murphy* for appellants.

1. John Martin was not the servant of appellants, but of appellee. Sh. & Redf. on Neg. (2d ed.), sec. 73 ; Bish. Non-Cont. Law, sec. 599.

2. The third, fourth and fifth instructions were erroneous. There was no evidence that there was any negligence as to the temperature of the baths. The temperature of the vapors was not variable.

3. The first, third and fourth instructions asked by appellants should have been given as asked. One who consents to an act which results in injury to him waives his right of action therefor. Bish. Non-Cont. Law, secs. 49, 618.

*Wood & Henderson* for appellee.

1. The verdict is conclusive as to injury and negligence.

2. The third, fourth and fifth instructions were framed to meet the evidence as to the place and manner of the injury and were un-objectionable, even if the temperature of the vapor was stationary.

3. John Martin was the servant of appellants. Wood, Master and Servant, pp. 630-1-2-3-4; *ib.* 10-11. The mere fact that appellee assented to Martin's leaving him was not negligence on his part; but if it was, it was not the proximate cause of the injury. Bish. Non-Cont. Law, sec. 462-3-4; 51 Ark. 476-7.

MANSFIELD, J. 1. The exception reserved to the refusal of the court to give to the jury the first instruction requested by the defendants, and the exception taken to the rejection of their fourth prayer, raise in effect the same question; and the point made upon both of these exceptions is that if the attendant, John Martin, acted under the plaintiff's direction or control while administering the baths, he was the servant of the plaintiff, and the defendants are not therefore liable for his alleged negligence. But we think the conclusion thus insisted upon is not, in a legal sense, deducible from the facts stated in the two instructions referred to, when those facts are considered in the light of all the other circumstances of the case.

1. When relation of master and servant exists.

Martin was one of several persons connected with the defendants' bath-house in the capacity of attendants upon persons who desired their assistance in taking baths. These attendants were selected by the manager of the bath house, and during the period of their service enjoyed the exclusive privilege of administering baths and of receiving the fees allowed therefor. In consideration of this privilege, they not only attended at the bath-house for the purpose of performing their duties in assisting bathers, but kept the bath rooms clean and made the halls between the rooms comfortable by keeping them

properly heated. It resulted, from the nature of their employment and from the supervision essential to the usefulness of the bath-house, that the attendants should be subject to the general control of the manager and to dismissal by him for any sufficient cause. The manager had power to assign either of them to the service of any visitor who had not selected an attendant for himself, and they could earn no fees otherwise than by using the rooms and other bathing appliances belonging to the defendants. Their labors were all in furtherance of the business enterprise in which the defendants were engaged; and it was entirely inconsistent with the interests of the latter, and with the duty they owed to the public as lessees and proprietors of the bath-house, that attendants upon bathers should be allowed to pursue their calling as independent contractors or as persons conducting a business not subordinate to the business of the defendants. This being so, we think the position of the attendants was such that the law, in affording a remedy to third persons for their negligence, will regard them as the servants of the defendants, whether they served under an actual contract with the defendants or not. Cooley on Torts, 623; Wood's Master and Servant, sec. 304.

But we think they acted under a contract with the defendants; and it is not speaking accurately to say that the administration of baths was the only service they rendered for the fees they received. The fees were paid to them by permission of the defendants, and were accepted as compensating them for all their labors at the bath-house, including their services in keeping the rooms and halls in a cleanly and comfortable condition. That they received no compensation except as it came to them in fees paid by the bathers they were selected or assigned to wait upon, and that bathers had the privilege of selecting their own attendants and paying the

fees directly to them, are facts which go to show that
the amount of the fees to be paid each attendant was
uncertain and contingent; but such facts are entirely
consistent with the proposition that the right to earn
any fees at all grew out of a contract with the defend-
ants.    Martin's position, then, was similar to that of a
servant at a hotel, to which reference is made by way of
illustration in the case of *Laugher* v. *Pointer*, 5 Barne-
wall & Cresswell, 579.   In that case it was held that
where the owner of a carriage hired a pair of horses of
a stable keeper to draw it, and the stable keeper pro-
vided a driver, the owner of the carriage was not liable
for an injury to a third person caused by the driver's
negligence.   '' This coachman,'' said the court, '' was
not hired to the defendant; he had no power to dismiss
him.   He paid him no wages.   The man was only to
drive the horses of the jobman.   It is true the master
paid him no wages, and the whole which he got was
from the person who hired the horses, but that was only
a gratuity.   It is the case with servants at inns and
hotels.   Where there is a great deal of business they
frequently receive no wages from the owner of the inn or
hotel, and trust entirely to what they receive from the
persons who resort to the inn or hotel, and yet they are
not the less the servants of the inn-keeper.''   See also
*Quarman* v. *Burnett*, 6 Meeson & Welsby,* 499.   This
ruling, it will be noticed, does not make the payment or
promise of wages a test of the existence of the relation
of master and servant; nor do any of the authorities
make the payment or expectation of compensation essen-
tial to the creation of that relation as to third persons.
'' The real test '' as to such persons, says Mr. Wood,
''is whether the act (causing an injury) is done by one
for another   *   *   *   with the knowledge of the person
sought to be charged as master, or with his assent,
express or implied.''   Wood's Master & Servant, secs.

7, 304, 306 ; *Mound City Paint & Color Co.* v. *Conlon*, 92 Mo. 221 ; *Kimball* v. *Cushman*, 103 Mass. 194 ; *Heygood* v. *State*, 59 Ala. 51.

There are many cases, of such familiar occurrence that it is needless to mention them, in which the duty of a servant to his master can only be performed by acts done according to the• direction of a third person whose convenience, taste, or physical condition determines the time and manner of doing them. If Martin had served for daily wages paid directly by the defendants, it would still have been his duty to them to administer baths to the plaintiff according to the directions of the latter, who was guided in his wishes by the advice of his physician. And in such case the plaintiff would not have had less power to discharge Martin as an attendant at the bath house or to regulate his general conduct there than he had in the present case. In either case he could· for good cause have refused the attendance of Martin, but he could not without the consent of the defendants have engaged the services of one whom they had not authorized to act as a regular attendant. Such being our view of the relation established between the parties by facts not in dispute, we think the court did not err in refusing to give the defendants' first and fourth instructions.

2. *When master liable for servant's negligence.*   2. The defendants' third request to charge was in substance that although Martin was their servant, if the plaintiff gave him permission to leave him after his legs were placed in the vapor bath, and in consequence thereof he received the injury of which he complains, he is not entitled to recover. The court added to this a clause to the effect that in the case stated by the instruction the defendants would not be liable unless Martin was guilty of negligence in failing to respond promptly to the plaintiff's call for assistance. The modification was proper for the reason that there was testimony tending to show that the plaintiff consented to Martin's absence on condi-

tion that he would return promptly on being called and that his failure to do so caused or aggravated the injury.

3. But the court's third, fourth and fifth instructions were not applicable to the only facts constituting a cause of action which the evidence tended to prove. The plaintiff's leg was injured either in the vapor box or in a bath tub in which he placed it after he left the vapor bath. If the injury was received in the tub, there is no contention that it was due to the negligence of Martin or any other attendant. If it was received at the vapor box through the want of proper attendance, or because the defendants were guilty of negligence in the construction of the box, or in failing to see that it was in a safe condition at the time the plaintiff used it, they were liable for the injury. The injury was peculiar in its effect upon the leg, and although the plaintiff testified that it was a burn and was received in the vapor box, he was unable to state the immediate cause of it. Whatever may have been the cause, the evidence did not warrant a finding that there was any neglect in fixing the temperature of the vapor bath, for it shows that the temperature of that bath could not be controlled by the attendants, and was uniform except as it was affected by the weather. The third, fourth and fifth instructions were therefore abstract and misleading, for each of them applies only to a case of neglect in preparing a bath the temperature of which was made too high. For this error in the court's charge, the judgment must be reversed, and the cause remanded for a new trial.

3. Instructions should not be abstract.