Terry v. Burford.

Terry *et al. v.* Burford.*

(*Nashville.* December Term, 1914.)

1. **TORTS. Torts of servant. Joint liability of several masters.**
    Where sixty property owners contracted with a special police
    officer to pay him $1 each per month, he to be under control
    of all of them and to report nightly for instructions from any
    of the subscribers at a certain place, the contract of hiring
    was joint, and not several, giving rise to a joint liability on
    the part of the subscribers for tortious acts committed by
    such officer within the scope of his authority and employment.
    (*Post, pp.* 459-464.)

    Cases cited and approved: Gaines v. Bard, 57 Ark., 615; Halupt-
    zok v. Great Northern R. Co., 55 Minn., 446; Pugmire v. Oregon
    Short Line R. Co., 33 Utah, 27; Burke v. Norwich & W. R.
    Co., 34 Conn., 474; Corning v. Walker, 100 N. Y., 547; Goodman
    v. Wilson, 129 Tenn., 464; Moore v. Southern Railway Co., 165
    N. C., 439.

    Cases cited and distinguished: Buchanan v. Chicago, 75 Iowa,
    393; Gulf, C. & S. F. R. Co. v. Dorsey, 66 Tex., 148.

2. **MASTER AND SERVANT. Tort of servant. Wrongful killing
    by special policeman. Scope of employment. Evidence.**
    In an action against property owners, who had jointly hired a
    special policeman, for the wrongful act of such officer in killing
    one whom he suspected of wrongdoing on one of the subscrib-
    er's premises, evidence as to whether the killing was within
    the general scope of the officer's authority *held* sufficient to
    sustain a verdict for plaintiff. (*Post, pp.* 464, 465.)

    Code cited and construed: Sec. 6997 (S.).

---

"As to the liability of joint employers for torts of the employee,
see note in 51 L. R. A. (N. S.), 866.

3. **MASTER AND SERVANT.** Servant's tort. Act in excess of particular authority.

In an action, against joint employers of a special policeman to guard their property, for the wrongful killing of plaintiff's decedent on the premises of one of such subscribers, where the officer discovered decedent under suspicious circumstances, in the exercise of his duty to guard the property, although his act in shooting was a misjudged and wrongful act, nevertheless, it being within the general scope of his authority, his employers were liable therefor. (*Post*, *pp.* 465-479.)

Cases cited and approved:  Eichengreen v. Railroad, 96 Tenn., 229; Moore v. Sanborne, 2 Mich., 519; Wright v. Wilcox, 19 Wend. (N. Y.), 343; Cox v. Keahey, 36 Ala., 340; Hughes v. New York & N. H. R. Co., 4 Jones & S., 222; Yerger v. Warren, 31 Pa., 319; Pittsburg, A. & M. Pass. R. Co. v. Donahue, 70 Pa., 119; Crocker v. New London, W. & P. R. Co., 24 Conn., 249; Brasher v. Kennedy, 10 B. Mon. (Ky.), 30; Harriss v. Mabry, 23 N. C., 240; Rounds v. Delaware, L. & W. R. Co., 64 N. Y., 129; Holler v. Ross, 68 N. J. Law, 324; Levi v. Brooks, 121 Mass., 501; Denver & R. G. R. Co. v. Harris, 122 U. S., 597; Magar v. Hammond, 183 N. Y., 387; Kusnir v. Pressed Steel Car Co. (D. C.), 201 Fed., 146; Arbuckle v. Kirkpatrick, 98 Tenn., 221; McManus v. Cricket, 1 East, 106.

Cases cited and distinguished:  Mott v. Consumers' Ice Co., 73 N. Y., 543; McClung v. Dearborne, 134 Pa., 396; Sharp v. Erie Railroad Co., 184 N. Y., 100; Railroad v. Carter, 129 Tenn., 463.

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* from the Court of Civil Appeals to the Supreme Court.— THOS. E. MATTHEWS, Judge.

LARKIN E. CROUCH and J. M. ANDERSON, for plaintiffs.

WILLIAM A. GUILD, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This action was brought in the circuit court of Davidson county to recover damages for the unlawful killing of Lawson Burford, Jr., son of the defendant in error. There were verdict and judgment for $3,500, and the plaintiffs in error appealed to the court of civil appeals. There the judgment as to Terry was affirmed, but reversed as to the other plaintiffs in error; that court holding that the trial judge should have granted a peremptory instruction in favor of the latter. The case then came here by *certiorari*.

The facts are as follows:

Z. T. Terry was a special policeman appointed by the board of public works and affairs of the city of Nashville. He was one of many appointed by the city to perform duties for the protection of special private citizens who would pay for their services such sums as the officers and the parties might agree upon. The regular policemen of the city were employed and paid by the city. Private policemen, like Terry, were employed and paid by the citizens whose property they were detailed to protect, and were subject to the orders of those employing them.

The appointment was made pursuant to section 268 of Smith & McAlister's Digest of the Laws of Nashville. This section, after making provision for the appointment of a regular police force, and for their compensation by the city, continues:

"Provided, however, that in addition to the force above authorized to be appointed, the board of public works and affairs be and they are hereby authorized to appoint such additional policemen, not exceeding two hundred in number, as the board may deem necessary for special duty, as members of the metropolitan police force, the services of said such special policemen to be paid for by the firm, company, or corporation for whom they may be appointed. Such special policemen shall each give bond to the mayor and city council in the sum of one thousand dollars, conditioned for the faithful discharge of their duties, and for the use and benefit of any person who may be wrongfully damaged whether in person or property, by their action."

The regular policemen of the city are required to report to the police department every two hours. They also report in person, and keep in constant communication and close touch. But there is no rule requiring special policemen, or watchmen, such as Terry was, to report. Such special policemen make no reports to the department at all. It was not the custom for the police department to give special policemen any instructions, and no instructions were given by that department to Terry. The custom was for the board of public works and affairs to appoint such special policemen upon re-

quest of the persons who desired their special services, and Terry was so appointed.

The contract with Terry was signed by sixty odd citizens, and was in the following language:

"Nashville, January, 1911.

"We the undersigned hereby agree to employ Capt. Z. T. Terry as special night policeman to guard our property along the following route:

"Commencing at the corner of West End avenue and Twentieth street; thence north on Twentieth to Hayes street; thence west on Hayes to Vanderbilt avenue; thence north with Vanderbilt avenue to Patterson street; thence west on the south side of Patterson street to Twenty-Third avenue; thence south on Twenty-Third avenue to Church street; thence west on Church street to Twenty-Fifth street; thence south on Twenty-Fifth street to West End avenue; thence east on West End avenue to Twenty-Fourth avenue; thence south on Twenty-Fourth avenue two blocks; thence north on Twenty-Fourth street to West End avenue; thence east on West End avenue to the place of beginning.

"Said Z. T. Terry will begin his rounds of the above territory during the fall and winter months before dark each day, and continue the same until four o'clock a. m., or longer, if necessary. In the summer time he will begin his rounds by sundown and continue until broad daylight. In consideration of the above services we will each pay to Capt. Terry the sum of $1 per month, payable at the end of each month during the continuance of this agreement. Capt. Terry will make his

headquarters during each night at ———, at which place he will report as near each hour as he can during the period of his watch for calls or instructions from the subscribers hereto.''

Opposite each name subscribed was the residence number of such subscriber.

The territory in question covers about five blocks, is about one-half a mile long, and one-fourth of a mile broad. The houses are not all contiguous.

None of the plaintiffs in error who subscribed to the paper at any time gave instructions to Terry what to do, or in what way to discharge his duties, further than those embraced in the contract. Terry states that the place to which he reported, left blank in the contract, was the Broad street engine house; that the only purpose for which he ever reported there was to obtain information, if any of the subscribers had any information to impart.

The area covered by the contract was in the residence part of the city, and the property to be watched and guarded consisted of the residences of the several subscribers and their appurtenant property.

Owing to the insufficient number of men composing the police force of Nashville, at and before the time the contract with Terry was entered into, police protection in the neighborhood in question was very limited. The policemen assigned to that part of the city had more territory than they could cover. Just before Terry was employed, a number of houses in the neighborhood embraced in the contract had been entered, several bur-

glaries had been committed, and much stealing had been going on. It was the existence of this state of affairs that caused the employment of Terry, to perform the services indicated in the contract.

Nothing was said concerning Terry's going armed, or the contrary, but the subscribers testify they supposed he was to be thus equipped as other policemen.

On the night of March 10, 1912, Z. T. Terry, while in the discharge of the duties imposed by the contract, entered on the premises of Mr. W. R. Cole, a party to the contract but not sued. While on Mr. Cole's premises Terry shot and killed Lawson Burford, Jr., Mr. Cole's chauffeur. Terry testifies that he had never seen the deceased before that night; that he had shadowed and traced two strange negroes into the back premises of Mr. Cole; that he saw Burford walk backwards and forwards in front of the back door of the basement of the dwelling house, and look around in a suspicious manner, and, believing him to be a person about to commit crime, he ordered him to throw up his hands; that Burford uttered a word of defiance and threw his hand behind him as if to draw a pistol, and thereupon two other negroes drew close to him, whom he believed were the same persons he had traced into the premises, and, believing his life was in danger, he fired one shot into the body of Burford; that thereupon the other two fled, and he fired at them, but without effect; that Burford ran into the basement of the building, and he saw nothing further of him at the time. A colored man and woman who were in the basement, in the room of the

woman, testified, in substance, that they heard some words just outside of the basement, and presently the door of the basement was unlocked and two persons entered; that one of them, who subsequently proved to be Terry, commanded Burford to knock on the woman's door, or open the door; that Burford replied that it was no use; that he lived there, and was Mr. Cole's chauffeur. Terry replied that that made no difference, to open the door; that if he did not he would kill him; that soon after this two or three shots were fired, and they went out and found Burford on the stairway leading from the basement to the upper part of the house in a dying condition, with the front of his shirt on fire. These witnesses testified that the language of Burford in his replies was mild and submissive.

The jury disregarded the evidence of Terry, indicating that he exercised the right of self-defense, and placed their verdict, without doubt, on the testimony of the two witnesses, the man and the woman referred to.

A motion was made in the trial court for peremptory instructions in favor of the defendants, who were subscribers to the contract, on the ground that the contract was several, not joint, and Terry was not acting as their agent, while he was protecting the house of W. R. Cole, also on the ground that the act of Terry in killing Burford was not in pursuit of his employment, but, was, on the contrary, out of the scope of his employment.

The court of civil appeals held that the peremptory instruction should have been given in behalf of the subscribers on both points.

1. Was the contract joint or several? In our opinion it was joint. It was signed by all the parties. It bound Terry to guard the property of. all, during the whole of each night. It specified when his vigil should begin and when it should end. It required that he should make "rounds" of the territory, and that the "rounds" should continue throughout the night, with the exception only that they should be broken by reports each hour at "headquarters" (subsequently fixed at Broad street engine house), "for calls or instructions from the subscribers hereto." When he was on his "rounds" he was in the service of all the subscribers, as much so on the streets of the neighborhood as when on the premises of any of his subscribers. The fact being publicly known that he was so traversing the neighborhood, watching and guarding, could not fail to deter the marauders who had previously invaded the neighborhood, and to largely prevent, if not wholly, similar outrages. It could not fail to give to the neighborhood a feeling of security, displacing the uneasiness previously experienced through the sense of insufficient police protection, on the occurrence of frequent burglaries. Nor can it be justly said that Terry's entry upon the premises of any one of the subscribers was a service to that person only. Such service, when required for protection or watching, was within the sense and meaning of the contract, and hence exacted by

all; moreover, faithfulness in this regard to each sub-
scribed could not fail to redound to the security of all,
as a warning to evildoers, that the protector of the
property, and of the homes of the subscribers, was vigi-
lant and active.  So we have here, contracted for, a
service to all, required by all; in addition, an agreement
to report hourly at "headquarters" for "calls or in-
structions from the subscribers," thus providing for
an hourly control.  It matters not that Terry says he
reported to headquarters for "information" only;
whether that "information" might be as to the wishes
or instructions of his employers, or what not, the es-
sential fact is that the contract provided for their con-
trol, not only by the specific directions given therein
for his nightly duties, but also for any further and
additional instructions his employers might see proper
to give him.

It is in no wise contradictory of the joint liability,
based on the proposition that Terry was the joint
servant of all, that each subscriber contracted to pay
only $1 per month each on the compensation.  The pay-
ment of compensation, or the contrary, is not by any
means a controlling fact (1 Labatt, Master and Serv-
ant, section 19; *Gaines* v. *Bard,* 57 Ark., 615, 22 S. W.,
570, 38 Am. St. Rep., 266; *Haluptzok* v. *Great Northern
R. Co.,* 55 Minn., 446, 57 N. W., 144, 26 L. R. A., 739;
*Pugmire* v. *Oregon Short Line R. Co.,* 33 Utah, 27, 92
Pac., 762, 13 L. R. A. [N. S.], 565, 126 Am. St. Rep.,
805, 14 Ann. Cas., 384), although it is a relevant fact,
and has more or less weight in determining the question

as to "whose servant was he," when there are other
facts bearing on the point (*Burke* v. *Norwich & W. R.
Co.,* 34 Conn., 474; *Corning* v. *Walker,* 100 N. Y., 547,
3 N. E., 290); but it is merely corroborative, and in-
deed practically useless, where it is otherwise shown
that the right existed to control the person whose *status*
is in question, the right of control itself being sufficient
to prove the relation of master and servant (1 Labatt,
M. & S., section 23). In determining whose servant
Terry was, the chief inquiry then is: Under whose
orders was he? This is answered by the contract in
the manner above shown, that he was subject to and
under the orders of all of the subscribers by the very
terms of the contract. This conclusion, if not strength-
ened, for it needs no strengthening, is illustrated by
the fact that he was doing service for all.

This latter circumstance is at times important, when
the power to control is not otherwise made apparent,
or is confused by services rapidly shifting from one
person to another, as in the case of guards at railroad
crossings, where numerous tracks are laid, and these
tracks are used by more than one company, but all
served by the same guard. Of a similar situation the
supreme Court of Iowa said, in *Buchanan* v. *Chicago,
M. & St. P. R. Co.*:

"The idea that the employee was under the employ-
ment of one company for five minutes, and then another
for a few minutes, and another for a short time, and
that he changed his employers with the facility with

which the kaleidoscope exhibits an array of colors, involves an absurdity.'' 75 Iowa, 393, 39 N. W., 663.

And in *Gulf, C. & S. F. R. Co.* v. *Dorsey,* 66 Tex., 148, 18 S. W., 444, wherein it appeared that a servant was injured while performing his duty in a union yard, it was held that, if the servant was injured by the negligence of either company, all were liable jointly and severally. The court said:

''Each defendant was a party to the negligence of the other. If either could relieve itself of the duty by a contract that the other should put and keep in proper condition the track where plaintiff was injured, no such contract was proved. Under the evidence, the track was the track of appellant as well as the track of the other defendant. It was defective, and at least partly caused the plaintiff's injury. But if the track was safe, and the injury was caused solely by defects in the cars of the other defendant, then . . . both defendants were liable. . . . The appellant is the last of the three masters that could escape liability. It hired the plaintiff; its yardmaster directed his labors. Betwixt it and him the relation of master and servant was created by express contract. That relation between him and the other companies arises by inference from the service and the connection of the companies inter se. . . . But it is insisted that the appellant was not the plaintiff's master at the time of the injury. The plaintiff was doing what the appellant employed him to do. The master cannot escape his liability by fixing liability upon another. Both are charged. But, under the facts

presented in this record, the plaintiff was the servant of all the companies interested in the union yard. Each of them owed him the duty of a master. The duty and the liability would be delusive, if at one moment the employee was the servant of one, at another the servant of another; here in the care of one, and there of another; as to the track dependent upon one company, as to the cars upon another, as to the movement of the engine upon a third. The policy, which requires of the master ordinary care, would be practically without sanction, if the servant's remedy was hidden in such a labyrinth.''

In the case just referred to it was held that where there are several masters of the same servant, in a situation like that described, all the masters are liable for the negligence of one towards that servant; and, conversely, it is true that all of the masters are liable for the wrongful act of the joint servant towards third parties while acting within the scope of his duties. *Goodman* v. *Wilson,* 129 Tenn., 464, 166 S. W., 752, 51 L. R. A. (N. S.), 1116; *Moore* v. *Southern Railway Co.,* 165 N. C., 439, 81 S. E., 603, 51 L. R. A. (N. S.), 866, and note. In this note, it is said:

''The great weight of authority is to the effect that joint employers are liable both jointly and severally for the torts of an employee, and this notwithstanding the particular service being rendered was for one only of the employers, and notwithstanding such employee was paid directly by only one of the joint employers.''

The soundness of the proposition is proven by the numerous cases cited in support of it, which may be there found fully digested.

2. Was the act of Terry complained of within the scope of his employment?

The question arises here on a review of the action of the trial judge in refusing to peremptorily instruct the jury that such act was not within the scope of Terry's agency. The point being one primarily for the jury, we can examine it only for the purpose of determining whether there was any evidence on which an affirmative verdict could be based. The jury, under a proper charge, rendered a verdict, in effect, that the act was within the scope of Terry's authority. Was there any evidence on which this verdict could be properly based? We have recited the facts. We have seen that Terry was charged with the protection of the property of all his employers. Believing that Burford was a marauder about to commit crime against the person or property of one of these employers, he apprehended him. Burford claimed that he lived on the premises, and was Mr. Cole's chauffeur. If this were true, he desired to hold him no longer. To ascertain the fact, he commanded Burford to knock on the woman's door, or to open it, so that inquiry might be made. We think the jury might properly so have construed the facts. Up to this point, then, Terry was clearly within his authority. If, on reasonable grounds, he believed that Burford was about to commit a breach of the peace (and such would have been an attack on Mr. Cole's

home), he had the lawful right to arrest Burford. Shannon Code, section 6997 (1). It was also proper that he should investigate for the purpose of ascertaining whether he should be held. Hence the pertinency of the inquiries. Failing to induce Burford to open the door, or knock on the door, that inquiry might be made, he lost proper self-control, and killed him. This was an excess of authority surely, but it was within the general scope of the authority, or agency, to protect the home of his employer. It was a misjudged act, a wrongful act, but was within the general purpose to protect his employer's property against one whom he believed to be a marauder.

Would the employer be liable for this excess? In *Eichengreen* v. *Railroad*, 96 Tenn., 229, 34 S. W., 219, 31 L. R. A., 702, 54 Am. St. Rep., 833, it appeared that one Stewart was chief of special agents or detectives employed by the railroad company, for the purpose of protecting the property of the company, and of ferreting out and prosecuting parties guilty of crimes against it. He had general instructions from the officers of the company not to make arrests without first consulting its local attorneys; but he was authorized to make arrests when the proof against the party was clear and there was not time to consult local counsel, lest the criminal might escape. On very insufficient evidence, and without consulting counsel, he caused Eichengreen to be arrested on a charge of knowingly and feloniously passing counterfeit money. When the matter was examined in court, Eichengreen was exonerated, and re-

lieved, and thereupon sued the company for false imprisonment. The defense was that Stewart, the special agent, had acted beyond the scope of his authority. A verdict and judgment having been rendered in favor of the company, Eichengreen appealed to this court, and here assigned as error the refusal of the trial judge to charge the jury as follows:

"If you find from the proof that the plaintiff was illegally and wrongfully arrested in Gallatin, August 9, 1891, and that his said arrest was caused or procured by the agents of the company, while acting within the scope of their authority, either express or implied, then the company would be responsible, although the said agents, in procuring or causing his wrongful arrest, were exceeding their authority, or acting in the matter contrary to instructions."

The court held that this instruction should have been given, especially to correct an affirmative error in the charge of the trial judge, wherein it appeared that he had instructed the jury that, if they found that Stewart was acting in the capacity of detective for the company, they should next inquire whether he was acting within the scope of the authority conferred on him by the company, "because if he was acting as such detective of the company, if he at the time was exceeding his authority, then he would be liable, not the company." The court said:

"The instruction was erroneous, for the law is that, if the agent is acting within the scope of his employment, the master is liable, although the particular act

Terry v. Burford.

may have been in excess of his authority and directly contrary to instructions.''

We are referred to several prior cases decided by the court which are assumed to be in conflict with the principles of the case just referred to. We are of the opinion they can be reconciled with this case, but, if not, must be considered as having been modified in so far as they may be in conflict with the said case of *Eichengreen* v. *Railroad,* supra. In this connection, the. following observations by the New Jersey court of errors and appeals are applicable:

''Under the early English authorities, beginning with Lord Kenyon's judgment in *McManus* v. *Crickett,* 1 East, 106, for such an act as that done by this defendant's servant, the master was not liable. The early cases made the test of the master's liability depend upon the moral quality of the act, instead of leaving it to depend upon the question of whether the act was done in the line of the master's business and within the scope of the servant's employment. This was not only true in England, but in this country. *Moore* v. *Sanborne,* 2 Mich., 519, 59 Am. Dec., 209; *Wright* v. *Wilcox* [19 Wend. (N. Y.), 343], 32 Am. Dec., 507, note; *Cox*. v. *Keahey,* 36 Ala., 340, 76 Am. Dec., 325; *Hughes* v. *New York & N. H. R. Co.,* 4 Jones & S., 222; *Yerger* v. *Warren,* 31 Pa., 319; *Pittsburg, A. & M. Pass. R. Co.* v. *Donahue,* 70 Pa., 119; *Crocker* v. *New London, W. & P. R. Co.,* 24 Conn., 249; *Brasher* v. *Kennedy,* 10 B. Mon. (Ky.), 30; *Harriss* v. *Mabry,* 23 N. C. (1 Ired. Law), 240. It will not be necessary to cite the cases

which show that this rule is no longer followed in England or this country. . . . The rule has been gradually extended, until it may be said that the liability of the master for the willful, wrongful, and malicious acts of the servant now extends to every case where the act of the servant is done with a view to the furtherance and discharge of his master's business and within the scope and limits of his employment. *Mott* v. *Consumers' Ice Co.,* 73 N. Y., 543; *Rounds* v. *Delaware, L & W. R. Co.,* 64 N. Y., 129, 21 Am. Rep., 597; 20 Am. & Eng. Enc. Law (2d Ed.), p. 169.'' *Holler* v. *Ross,* 68 N. J. Law, 324, 329, 53 Atl., 472, 474, 59 L. R. A., 943, 946, 96 Am. St. Rep., 546, 550.

And see 54 Am. St. Rep., note, 72, 85, 86.

In *Mott* v. *Consumers' Ice Co.,* supra, it is said:

''The rule recognized in all the recent cases, and which does not materially conflict with any of the older decisions, although it may qualify some of the intimations and casual expressions or illustrations of the judges, is that for the acts of the servant, within the general scope of his employment, while engaged in his master's business, and done with a view to the furtherance of that business and the master's interest, the master will be responsible, whether the act be done negligently, wantonly, or even wilfully. In general terms, if the servant misconducts himself in the course of his employment, his acts are the acts of the master, who must answer for them.''

But as held in these and other cases, if the servant goes outside of the scope of his employment, and, to

serve some purpose of his own, does a wanton or mali-
cious act to the injury of another, the master is not
liable.

Other illustrations of the principle are the following:
It is held that a master sending his servant to take
possession of furniture, forfeited to him by nonpay-
ment of the price, is liable for a willful assault by the
servant committed in getting the property. *Levi* v.
*Brooks,* 121 Mass., 501. A railroad company, which,
by force, took possession of a line of road in the peace-
able possesison and control of another, was held liable
to an employee of the latter company for an assault
upon him by its servants in thus taking possession.
*Denver & R. G. R. Co.* v. *Harris,* 122 U. S., 597, 7 Sup.
Ct., 1286, 30 L. Ed., 1146. It was also held that instruc-
tions to an employee, not to commit an assault when
sending him to get an organ which was in the possession
of another, knowing that the errand was likely to excite
indignation and resistance, would not relieve the em-
ployer from liability for a wrongful assault by the em-
ployee while engaged in the business of seizing and
carrying away the organ. *McClung* v. *Dearborne,* 134
Pa., 396, 19 Atl., 698, 8 L. R. A., 204, 19 Am. St. Rep.,
708.

The facts in this latter case are thus recited by the
court:

"An expedition was fitted out, consisting of two men
and a team, under the direction and control of Fox,
for this purpose. Before they set out, they were in-
structed by Dearborne not to commit an assault and

battery on any person, and not to break the law. They
went to McClung's house, secured admission to the par-
lor by a false pretense, and began the removal of the or-
gan.   Mrs. McClung and her son, who happened to be at
home, tried to resist, but were at once overpowered,
and the organ and its belonging carried off.   The scene
is described by one of the witnesses thus:  'I came
down and saw Mr. Fox.  He was holding my mother
up against the parlor door.  I came forward, and my
brother came out, and asked what all this meant.  He
said:  'Just this: If you interfere with my business,
I will shoot you dead'—and reached in his back pocket.
.  .  .  He said:  'I came to take this organ out of
here.  If you interfere with my business, I will shoot
you.'  Then my brother said:  'You do not take this
organ out of this house.  Show your authority.  If you
don't, you take it over my corpse.'  .  .  .  Then he
clinched my brother.  .  .  .  Then the two colored
men came in, and began knocking us about.  .  .  .  I
then went to the corner and saw a policeman, and asked
him to come down.''

Referring to the charge of the trial judge to the
effect that whether Dearborne was responsible for the
act above mentioned depended on the instructions he
gave when he started Fox out on the expedition.   The
court said:

''The general doctrine laid down by the learned
judge, that every man is liable for his own trespasses,
must not be taken too literally, for one must be held
to do that which he procures or directs another to do

for him, as well as that which he does in his own per-
son. . . . Servants and employee are often without
the means to respond in damages for the injuries they
may inflict on others by the ignorant, negligent or wan-
ton manner in which they conduct the business of their
employer. The loss must be borne in such cases by the
innocent sufferer, or by him whose employment of an
ignorant, careless, or wanton servant has been the oc-
casion of the injury; and, under such circumstances,
it is just that the latter should bear the loss. But the
master is not liable for the independent trespass of his
servant. If a coachman, while driving along the street
with his master's carriage, sees one against whom he
bears ill will at the side of the street, and leaves the box
to seek out and assault him, the master would not be
liable. Such an act would be the willful and indepen-
dent act of the coachman. It was done while in his
master's service, but not in the course of that service.
But if the coachman sees his enemy sitting on the box
of another carriage, driving along the same highway,
and he so drives his own team as to bring the carriages
into collision, whereby injury is done, the master is
liable. The coachman was hired to drive his master's
horses. He was doing the work he was employed to do,
and for the manner of his doing it the master is liable.
. . . Here Fox and his helpers were sent to bring
away the organ. The acts complained of were com-
mitted in the course of, and as a means to, the accom-
plishment of that for which they were sent. Let it be
conceded that they were instructed to do no wrong, and

that they did what they were warned not to do. The master is nevertheless liable. When he sends them upon an errand that exposes them to resistance and danger and the excitements consequent upon the presence of such a state of things, he must take the chances of their self-control and ability to obey."

In *Sharp* v. *Erie Railroad Co.*, 184 N. Y., 100, 76 N. E., 923, 6 Ann. Cas., 250, it is said: "A railroad company employing a servant who happens to be a public officer acquires no immunity from such employment. Constables and policemen are often employed by corporations in the same capacity as Wheeler was. It is not beyond the province of a jury in such a case to find that the official acts of the employee are to be used for the benefit of the defendant and in protection of its interests or property. And hence, in such a case, the character of the servant's act is to be determined in the same way and upon the same principles as if he was not a public officer at all. If he acts maliciously or in pursuit of some purpose of his own, the defendant is not bound by his conduct; but if, while acting within the general scope of his employment, he simply disregards his master's orders and exceeds his powers, the master will be responsible for his conduct."

Wheeler was an employee of the railroad company, whose duty, among other things, was to protect the company's interests on the right of way, to keep tramps from trains, and look after robberies that might occur at stations, and on freight cars in the yards, and on the tracks, and generally to look after crimes committed

against the railroad company on the right of way. It was part of his duty to drive off and keep off trespassers from the company's property.

It appeared that some boys were stealing a ride on one of the freight trains of the railway company, and at Elmira, learning that detectives were in the yard, they got off as quickly as possible. They jumped from the moving train and were pursued by Wheeler along the railroad track for some distance to the west, when one of the boys turned at right angles and passed to the adjacent land through an open gate. The pursuit was continued by Wheeler for about fifty feet on the adjoining land, and when the boy, being ahead of him, was about one hundred feet from the railroad premises, Wheeler drew a pistol and fired at him, the ball entering the back of his head, producing death. The court held:

"That it was for the jury to determine whether Wheeler acted within the scope of his employment, or whether, being a public officer, he acted in that capacity alone."

In *Magar* v. *Hammond*, 183 N. Y., 387, 76 N. E., 474, 3 L. R. A. (N. S.), 1038, it appeared that an action was brought to recover damages for injuries inflicted by a shot from a rifle in the hands of one Thomkins, a watchman in the employ of Hammond. There was evidence to the effect that Thompkins was employed to guard a fish pond from trespassers, and that, as he was going by in a boat, he fired at Magar and struck him in the manner stated. Magar, with two companions, had

been taking trout from the pond, and was in the woods on the bank when Thompkins fired. There was evidence also to the effect that Thompkins was not aware that any one was in the adjacent woods, and fired his gun merely to frighten any trespassers who might be in the vicinity. The court said that if Thompkins was aware or believed that Magar or any other human being was on the bank of the pond, and shot Magar willfully, intending to hit him or some human being, or if, without intending to hit Magar or any human being, he recklessly or wantonly shot where he had good reason to believe there were human beings, then he would be liable for the injury caused to Magar. The court continued:

"To render the defendant Hammond [the master] liable for the willful, reckless, or wanton act of Thompkins, the act must have been done by Thompkins in the scope of his employment; and whether it was so done should be submitted as a question of fact to the jury. . . . If Thompkins, not having the interests or services of his master in mind, and acting maliciously or in order to effect some purpose of his own, shot the plaintiff, then his master, the defendant Hammond, is not liable for his act; but if his act was within the general scope of his employment, and done with a view to the furtherance of his master's business, then Hammond is liable, whether the act was willful, wanton, or reckless."

There are many other cases upon the same subject, but we shall refer to only one more, viz., *Kusnir* v.

*Pressed Steel Car Co.* (D. C.), 201 Fed., 146. The facts of that case, so far as necessary to state them, were that Charles P. Smith, who at the time of the transaction in question was in the employ of the defendant company as an armed watchman, was also a police officer of the State of Pennsylvania. On the occasion in question it appeared that there was fear of disorder among the employees, and Smith was on the premises pursuant to his employment, to act in the behalf of the defendant, if occasion required. Orders had been given for the men to return to their homes. Kusnir gave evidence tending to show that he was departing in a peaceable manner, when he saw Smith in his path armed and engaged in an altercation with a big Russian; that he was afraid, and, to avoid danger and injury, dodged under a table of steel rails or beams; that the Russian escaped Smith, who excitedly and negligently mistook Kusnir for the escaping Russian, and pursued him, and, as he endeavored to get from under the beams and go away, that Smith carelessly, negligently, and wrongfully, seeking to keep order pursuant to his employment by defendant, first struck Kusnir on the head, and then, he not coming out, reached down and with his revolver or pistol willfully, negligently, and unnecessarily shot the said Kusnir through the arm, as he was on his hands and knees doing no harm and committing no violence. There was a verdict returned for $8,500 damages on this state of facts, and the court refused to grant a new trial. In the course of the opinion the court said:

"Where private parties, even with the consent of the State, employ its police officers to represent them, and do special work for them in protecting and preserving their property and maintaining order on their premises, and such officers are engaged in the performance of their duties to their employers, and are acting within the scope of their powers and duties, they become and are the servants and employees of such private parties and their representatives, and for grossly negligent acts, wantonly, willfully, and unnecessarily committed by them in the line of their duty, and when engaged in the performance of such duties, to the injury of others, the master or employer is liable. Employers cannot escape responsibility for the grossly negligent, wanton, and willful acts of persons employed by them, and representing them, and paid by them, by employing constables, marshals, sheriffs, and peace officers of the State, provided such grossly negligent, willful, wanton, and wrongful acts are done by such representatives where and while acting within the general scope of the authority conferred on them."

These principles are recognized in our own very recent case of *Railroad* v. *Carter*, 129 Tenn., 463, 166 S. W., 593. The principal subject there discussed was the amount of damages; the liability not having been questioned in this court. However, it was said, at the close of the opinion:

"It has become customary throughout this State for large enterprises of every character to have certain employees appointed special officers and clothed with

police authority.   While this practice may be desirable
for the protection of the property of such concerns, it.
has led to many abuses.   These men so clothed with of-
ficial power lack the experience and discretion of reg-
ular State and municipal officers, and their conduct has
very generally been oppressive and flagrant.   In view
of the well-known tendencies of these special officers,
parties so employing them will be held to a strict de-
gree of accountability for the acts of such dangerous
agents.''

It results that the judgment of the court of civil ap-
peals must be reversed, and that of the trial court af-
firmed.

Mr. Justice Buchanan delivered a dissenting opinion
as follows:   The contract under which Terry was em-
ployed, as I see it is no more than a several employment
by each of the property owners.   Each of them agreed
to pay Terry $1 per month, payable at the end of each
month, and this compensation was manifestly promised
by each for the purpose of protecting his individual
property.   If, under this agreement, all had failed to
pay, save one subscriber, that one would not have been
liable to pay Terry what each of the other subscribers
had failed to pay.   When each subscriber signed his
name, there was set opposite the number of his place
of residence.

The contract outlined a route over which Terry would
travel in order to keep watch for each subscriber over
his individual property.   The insertion of this matter
in the contract was a mere fancy of the draughtsman

and, as it seems to me, should signify nothing in the construction of the contract. The contract named a place which Terry would make his headquarter during the night, where he would report each hour as near as might be, for calls or instructions from the subscribers. This is not at all inconsistent with the construction that the contract is several and not in any sense joint.

The object of construction is to ascertain the intention of the parties, and the important question is: What the contract means as a whole? Page on Contracts, vol. 2, section 1112; *Arbuckle* v. *Kirkpatrick*, 98 Tenn. (14 Pick), 221, 39 S. W., 3, 36 L. R. A., 285, 60 Am. St. Rep., 854. Again says Mr. Page:

"It is a recognized rule of construction that the court will place itself in the position of the parties who made the contract as nearly as can be done by admitting evidence of surrounding facts and circumstances, the nature of the subject-matter, the relation of the parties to the contract, and the objects sought to be accomplished by the contract." Page on Contracts, vol. 2, section 1123.

The present contract, without extrinsic evidence, affords ample light upon the surroundings of the parties and their object in the execution thereof. Terry's object was to secure a wage of $1 per month from each subscriber, and the object of each subscriber was to have Terry watch the property owned by the particular subscriber. Manifestly these subscribers had no thought, purpose, or object other than as above indicated, and the same is clear as to Terry.

If there was no agreement by each subscriber that he would be liable to Terry for the full amount of the aggregate monthly compensation which Terry expected to receive under the contract in the event all of the other subscribers should fail to pay their *pro rata* portion of such compensation, and if Terry never so construed the contract, would the contract be joint or several? I think it would be clearly a several contract, and if so, there was under it no joint liability. Such liability could only be the legal result of a joint contract. Without doubt Terry looked to the solvency of each individual subscriber for his monthly pay of $1.

Contracts should be construed according to the object and purpose of the parties at the time the contract was made. Courts should not place on a contract a construction materially different from that which the parties intended at the time the contract was executed. I am clear upon the point that the contract in question would have received no subscribers had the construction, which the majority opinion has placed upon it, been suggested as the proper construction at the time it was executed. I have no quarrel with the general principles underlying the cases relied upon in the majority opinion. I think, however, those cases are clearly distinguishable from the present one upon their facts.

For the foregoing reasons, I respectfully dissent from the holding of the majority in this cause.