## *Eichengreen *v.* Railroad.

(*Nashville.* February 18, 1896.)

1. FALSE IMPRISONMENT. *Master liable when caused by his servant.*

    False imprisonment of an innocent person, on a charge of attempting to pass counterfeit money, which is procured by a railroad detective while acting within the scope of his authority, renders the railroad company liable, although in this particular matter he exceeded his authority, and acted contrary to his instructions respecting the caution to be exercised. (*Post, pp. 230–239.*)

    Cases cited and approved: Cantrell *v.* Colwell, 3 Head., 471; Byram *v.* McGuire, 3 Head, 530; Diehl *v.* Ottenville, 14 Lea, 191; 50 Am. Rep., 102; 43 Am. Rep., 141; 34 Am. Rep., 494; 99 Ind., 519.

2. SAME. *Same.*

    An express order for an unlawful arrest by an agent of a railroad company, is not necessary to render the company liable, if the arrest was procured by the agent, acting within the scope of his employment. (*Post, pp. 239–241.*)

---

FROM SUMNER.

---

Appeal in error from Circuit Court of Sumner County. A. H. MUNFORD, J.

J. W. BLACKMORE, G. W. BODDIE, and S. F. WILSON for Eichengreen.

---

*The liability of a master for false arrest or imprisonment by his servant, is the subject of a note to Mulligan *v.* New York & R. B. R. Co. (N. Y.), 14 L. R. A., 791.

Eichengreen v. Railroad.

J. J. Turner and Dismukes & Seay for Railroad.

McAlister, J.   The plaintiff sued the defendant company in the Circuit Court of Sumner County to recover damages for an alleged false imprisonment. There was a verdict and judgment in favor of the plaintiff for one dollar.   The plaintiff appealed, and has assigned errors.

The plaintiff, Eichengreen, was a drummer, representing a Philadelphia firm engaged in the manufacture of soaps.   On reaching the town of Gallatin, Sunday evening, August 9, 1891, he was arrested by two policemen as he stepped from the train of defendant company.   The arrest was made in pursuance of a telegram sent from Bowling Green, Ky., by one W. J. Stewart, who was in the employment of defendant in the capacity of a special agent or detective.   The record discloses that the plaintiff, Eichengreen, had for several days been in Bowling Green, and, desiring to go to Gallatin, Tenn., he went to the railroad ticket office to purchase a ticket.   In payment of his ticket he handed the agent a five dollar bill, which the latter pronounced counterfeit.   Eichengreen explained that he had received the bill from one of the banks in Bowling Green, and remarked to the agent, "You are off!" He then handed the agent a twenty dollar bill, and received his change.   Stewart, the special agent or detective of the company, claims that he was standing near and overheard the conversation between the

plaintiff and the ticket agent at Bowling Green; that the plaintiff was in company with one Newmark, and that plaintiff, Newmark, and himself all boarded the train at Bowling Green, going south. Stewart further stated that on the train the plaintiff and Newmark talked a good deal in a foreign language; that they exchanged coats, and one of them asked him (Stewart) if there was not a train out of Gallatin that night about ten o'clock. Stewart testified that these facts aroused his suspicions, and he came to the conclusion these men were crooks. He thereupon sent to the telegraph operator at Gallatin the following dispatch:

"Tell your police authorities to meet me at depot. A man on train with counterfeit money going to get off at your station. Tried to pass five dollars of it at Bowling Green.

"(Signed)     W. J. STEWART."

As already stated, on the arrival of the train at Gallatin, Eichengreen and his companion, Newmark, were both arrested. It was claimed by plaintiff that they were pointed out by Stewart and the conductor of the train to the policeman who made the arrest. The prisoners were both taken to the city workhouse, where Newmark was released upon assurances from Eichengreen that the former had nothing to do with the matter, and, if any one was guilty of attempting to pass counterfeit money, he was the man. Eichengreen, after much trouble, and possibly two

hours detention, was permitted to deposit his watch and money with the city marshal as security for his appearance at the police court the following morning. It appears that no warrant was sworn out against the defendant, and, there being no proof against him, he was, the next day, discharged. Thereupon the plaintiff commenced this suit against the company for damages for false imprisonment. On the trial, it was shown that the five dollar bill Eichengreen attempted to pass at Bowling Green was counterfeit, but the latter testified that he had no knowledge of the counterfeit, explaining that while in Bowling Green he had boarded with one McLure; that he, Eichengreen, drew a draft on his house in Philadelphia for $50, and McLure had it cashed for him at a bank in Bowling Green; that among the bills paid McLure by the bank, and turned over by the latter to the plaintiff, was the five dollar bill in question. Stewart, the special agent or detective of the company, stated on the trial that he heard Eichengreen, the plaintiff, tell the ticket agent at Bowling Green, when the bill was refused, that he had gotten it from one of the banks at Bowling Green. It was insisted on behalf of the company that the arrest of plaintiff was not procured by Stewart, or any employee of the company, but, if it was, such act was not within the apparent or real scope of the agent's authority, and the company is not liable.

In respect of the first proposition, there was evidence tending to show that, on the arrival of the

train at Gallatin, the conductor of the train pointed
out the plaintiff to the policeman, who immediately
arrested him. About this time Stewart, the detec-
tive of the company, came up, and said to the po-
liceman, "Why have you not arrested the other
one; there are two of them," and, pointing to New-
mark, the policeman arrested him. It further ap-
pears that Stewart, after the arrest of these parties
at the depot, Sunday evening, proceeded on his way
to Nashville and sent back the following telegram
to the operator at Gallatin, viz.: "Let me know
what the officers found on those fellows. They tried
to pass twenty dollars at Louisville yesterday. They
are good stock if the officers work it. They in-
tended to work the town to-night and get out on
first train. Stewart." The record shows that Stew-
art also returned to Gallatin the next morning to
learn, as he claims, whether any counterfeit money
had been found on the prisoners. There was other
evidence tending to show Stewart's complicity in the
arrest of the plaintiff. On the subject of Stewart's
authority to make arrests, it was shown on the trial
that he was the chief of special agents or detectives
employed by the company. These detectives were
employed for the purpose of protecting the property
of the company and of ferreting out and prosecut-
ing parties guilty of crimes against the company.
Stewart, it seems, had general instructions from the
officers of the company not to make arrests without
first consulting the local attorneys of the road. It

was shown, however, that he was authorized to make arrests when the proof against the party was clear and there was not time to consult local counsel lest the criminal might escape. The plaintiff, who was following the business of a drummer, had visited Gallatin on previous occasions, and was, as already stated, well known to some of the merchants of that city, and, by them and others, proved an excellent character on the trial below. The jury returned a verdict in favor of plaintiff for one dollar. The result of the verdict is that the plaintiff is onerated with the payment of a heavy bill of costs, since, by the terms of our statute, the plaintiff in an action for false imprisonment recovers no more costs than damages, unless his recovery exceeds the sum of five dollars. This verdict practically absolves the company from all liability, and upon this basis the assignments of error will be considered.

The first assignment is that the Court erred in refusing plaintiff's fourth request, viz.: "If you find from the proof that the plaintiff was illegally and wrongfully arrested in Gallatin, August 9, 1891, and that his said arrest was caused or procured by the agents of the company, while acting within the scope of their authority, either express or implied, then the company would be responsible, although the said agents, in procuring or causing his wrongful arrest, were exceeding their authority or acting in the matter contrary to instructions."

We think this assignment well taken, and that the

instruction asked should have been given, especially
for the purpose of correcting an affirmative error on
this subject in the general charge.   The trial Judge
had instructed the jury that if Stewart was not act-
ing in the capacity of a detective for the company,
the defendant would not be liable under any cir-
cumstances.   He then continues: "But if you find
he was so acting, you will next proceed to inquire
if he was acting within the scope of the authority
conferred upon him by the company, because, if he
was acting as such detective of the company, if he
at the time was exceeding his authority, then he
would be liable and not the company."   This in-
struction was erroneous, for the law is that if the
agent is acting within the scope of his employment,
the master is liable although the particular act may
have been in excess of his authority and directly con-
trary to instructions.   Says Mr. Wood, in his work
on Master and Servant, Sec. 307, viz.: "It is not
necessary, in order to fix the master's liability, that
the servant should, at the time of the injury, have
been acting under the master's orders or directions,
or that the master should know that the servant was
to do the particular act that produced the injury in
question.   It is enough if the act was within the
scope of his employment, and, if so, the master is
liable even though the servant acted willfully and in
direct violation of his orders.   A master cannot screen
himself from liability for an injury committed by his
servant within the line of his employment, by setting

up private instructions or orders given by him and their violation by the servant. By putting the servant in his place, he becomes responsible for all his acts within the line of his employment, even though they are willful and directly antagonistic to his order. . . . The master can never escape liability for an abuse of an authority by the servant; therefore, the question always is whether there was any authority, express or implied, on the part of the servant to do the act." See also Section 309. Again, the same author, at Section 299, says: "The question is not whether the particular act was authorized, but whether the act done grew out of the exercise of an authority which the master had conferred upon the servant. In other words, whether it is an incident to the authority granted, and done in the line of the servant's duty." The author then illustrates the principle with a case bearing some analogy to the case at bar. "Thus," says the author, "it would be absurd to hold that a person who has employed a detective to discover and arrest persons committing certain depredations upon his property could only be chargeable for arrests legally made by him, upon the ground that the employer must be presumed to have only employed him to act in a legal manner and upon legal grounds. Having employed the detective to make arrests at all, it intrusts him to make any arrests in the line of his duty which he deems advisable, and, if he makes an

illegal or improper arrest, the employer is responsible therefor.''

Thus, in the Indiana case, *Evansville R. R. Co.* v. *McKee*, 99 Ind., 519, the railroad company employed a detective to detect, arrest, and prosecute persons who unlawfully obstructed its railway, and in the performance of his duties he, without legal authority, arrested the plaintiff, who was an innocent person. It was held the company was liable for the false imprisonment of the plaintiff by the detective. *Lynch* v. *Metropolitan R. R. Co.*, 90 N. Y., 77 (50 Am. Rep., 102); *Williams* v. *Planters Ins. Co.*, 57 Miss., 759 (43 Am. Rep., 141); *Goff* v. *Great Northern R. R. Co.*, 30 L. J., O. B., 148 (34 Am. Rep., 494); Am. & Eng. Enc. L., Vol. I., p. 415, note 2; *Cantrell* v. *Colwell*, 3 Head, 471; *Byram* v. *McGuire*, 3 Head, 530; *Diehl & Lord* v. *Ottenville*, 14 Lea, 191.

The record discloses that Stewart, the special agent or detective of defendant company, was employed to look after any irregularities that he saw on the line of the road or divisions, investigate cases of robbery, obstructions on the track, and crimes against the company; that when a depredation of any character had been committed, it was in the line of his duty to investigate it thoroughly, get all the information he could about it in his own way, and then go to the company's attorney and take advice in respect of the proper course to pursue. But there was also evidence tending to show

that if the detective caught parties in the act of breaking into a depot, or breaking into a car, or placing obstructions on the track, or doing any kindred act, when there was not time to consult anybody, and the party might escape, then he would have a right to make an arrest. So it is obvious from this evidence that this detective was especially charged with the apprehension and prosecution of parties committing offenses against the company, and, while under general instructions it was the duty of the agent to consult the local attorney before making an arrest, it is shown that in certain emergencies the authority of the agent to make an arrest without such consultation was recognized. The attempt to pass a counterfeit bill upon the ticket agent was certainly an offense against the company, and having been committed in the presence of this detective, the right to arrest, or procure the arrest of the guilty party, may fairly be said to have been in the line of his employment, and within the authority conferred upon him. But the agent was bound, at the peril of the company, to know that the accused party was in the act of committing a crime, and not innocently passing the bill, and not himself the victim of the counterfeit. The record discloses that this detective was in the habit of exceeding his authority in making arrests, and this fact was known to the company. In November, 1888, he arrested two persons at Birmingham, and had them lodged in jail. Mr. Harraham, at that

time general manager of the company, wrote to him, viz.: "You must be very careful hereafter, and not make any arrest without first consulting our attorneys, and getting their opinion as to the company's case. I would rather that the arrest should not be made than that the company should get into any trouble over having made an arrest without being able to establish a case against the party or parties arrested. Please bear this in mind in future." This letter serves to illustrate the character of Stewart's employment, and the manner in which he exercised his authority, and also fixes knowledge of that fact upon the company. We are, therefore, of opinion the Circuit Judge erred in refusing the instruction asked.

Assignments of error are also made upon certain instructions given the jury at the request of defendant's counsel. The first instruction was, viz.: "If Stewart simply telegraphed the operator to notify the police that a man was on train who had passed, or attempted to pass, counterfeit money, then that would not authorize the police to arrest him, unless he was directed to do so by an agent who had authority to act in such a matter." This instruction, in the opinion of the Court, was misleading, since it does not give the entire import of the telegram. The message from Stewart, it will be remembered, begins, viz.: "Tell your police authorities to meet me at the depot," and there was evidence tending to show that, upon the arrival of the

train, Stewart and the conductor pointed out the two suspects to the policemen. Again, the instruction is erroneous, in that the liability of the company for the arrest is made to depend upon the order or direction of the agent, when the company would be equally liable if the agent procured the arrest, or set in motion the machinery by which the arrest was made, although not expressly ordering or directing it.

For the same reason we think the following instruction, submitted to the jury at the request of defendant's counsel, was also misleading, to wit: "If W. J. Stewart was ordered by his employer to not arrest parties, but to report the same to the railroad authorities, unless in an urgent case of wrong to the company, and if Eichengreen simply offered to pass a counterfeit bill at Bowling Green, then, unless said Stewart ordered his arrest or swore out a warrant against the plaintiff, the defendant would not be liable in this case."

For the same reason, the ninth request of defendant's counsel should not have been given in charge to the jury. In this latter instruction, the Court sets out the telegram sent by Stewart to the operator at Gallatin, and instructs the jury that it would not authorize the plaintiff's arrest unless Stewart or some one of defendant's employees ordered it. It is not necessary that the arrest of plaintiff should have been expressly ordered by any agent of the company, but if it appear that it was procured by

any agent of the company, acting within the scope of his employment, the company would be liable.

It is also assigned as error that the Circuit Judge, in explaining the measure of damages, used this expression, viz.: "You will consider these things upon the question of damages, if you ever get to that point," etc. It is objected that this expression was improper, since it was calculated to convey to the mind of the jury the impression that, in the opinion of the Court, there would be difficulty on the part of the jury in reaching the assessment of damages. But we do not feel called upon to determine this question or other errors assigned, as they may not arise on a new trial in the objectionable form in which they are now presented.

The judgment is reversed, and the cause remanded for a new trial.