## SOUTHERN RY. CO. v. PICKLE.

### (*Knoxville.* September Term, 1917.)

1. **TRIAL.** Question of law. Definition of term. Scope of authority.

What is meant by the term "apparent scope of an agent's au-
thority" in the abstract is a question of law, a matter of defi-
nition for the court. (*Post, p.* 224).

2. **PRINCIPAL AND AGENT.** Scope of authority. Questions for jury.

Whether facts testified to in a given case exhibited an assertion
of authority by one as agent of another with his consent or
acquiescence, and whether the power so asserted is a reason-
able inference from express powers proved, are questions for
the jury. (*Post, p.* 224).

3. **CARRIERS.** Ejection of passenger. Scope of authority. Questions for jury.

Evidence *held* insufficient to show that it was within the apparent
scope of a railway conductor's authority to collect in cash a
return fare with the going fare, so as to render the railway lia-
ble, when, after he had collected such amounts and plaintiff at-
tempted to return on his train, she was ejected for nonpayment
of fare. (*Post, pp.* 224-247.)

4. **CARRIERS.** Ejection of passenger. Scope of authority.

The mere fact that a railway conductor has the right to accept
cash fares on a going trip from a stop which had no ticket
agent did not give him the right at that time to accept fares
for the return trip from a station where tickets were sold.
(*Post, pp.* 247, 248.)

FROM CAMPBELL.

Appeal from the Criminal and Law Court of Campbell County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—XEN HICKS, Judge.

L. D. SMITH and POWERS & TRAMMEL, for appellant.

JOHN JENNINGS, JR., and H. B. BROWN, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This action was brought in the criminal and law court of Campbell county, to recover damages of the plaintiff in error for an alleged wrongful expulsion from its train. The facts stated in the most favorable way to the defendant in error are these:

The defendant in error, when the occurence complained of happened, was a young girl seventeen years old. Living at Eagen, on the line of the plaintiff in error's road, and desiring to go to Clearfield, two miles distant on the same road, she entered the train and appropriated a seat in the usual way. She testified that, when the conductor approached her to collect the fare, "I told him I was going to Clearfield and back, and I gave him twenty-five cents, and he gave me back a

nickle.'' The regular fare between the two points was ten cents each way. There was no ticket office at Eagen, and therefore she was permitted to pay the fare in money without extra charge. There was a ticket office at Clearfield, and under the rules of the company the conductor was required, on taking cash fares to charge, when parties entered the train from a station having a ticket office, an extra fifteen cents. Defendant in error knew that there was a ticket office at Clearfield, and that it was customary for people to buy tickets there, but she regarded what passed between her and the conductor, as detailed above in the quotation from her evidence, as an agreement on his part to accept the return fare from her in cash at the time she payed her fare going to Clearfield; that in retaining the twenty cents out of the twenty-five cents he had assented to the right on her part to return without procuring a ticket. Accordingly, when she was about to enter the train for her return, on the same day, and her companion with her, Miss Murray, urged her to buy a ticket, she replied that she had already paid her return fare. After the train had proceeded on its return to Eagen, the same conductor, on his round collecting fares, made demand of the defendant in error. She replied that she had paid him for the return trip as she went to Clearfield that morning. The conductor denied that she had paid him, and demanded her fare. She tendered him ten cents, saying it was all the money she had. He replied that she must pay him twenty-five cents, and threw the money

back into her lap, and instructed the brakeman to remove her from the train. Twenty-five cents was the correct cash fare by the rules of the company, as previously stated, when the passenger had entered the train at a station having a ticket office, and had procured no ticket. Defendant in error was removed from the train without violence or insult of any kind, one and one-fourth miles from her home. She walked the distance in about half an hour, and arrived without accident or injury, but much wounded in her feelings.

The defendant in error admits that she had never attempted to pay the going and return fare in cash to the conductor on the plaintiff in error's road, though she says she had done this once on the line of the Louisville & Nashville Railroad. There is no evidence that there was any custom or habit of the plaintiff in error's conductors to receive fares in the manner stated, and there is no evidence of any express authority.

The jury rendered a verdict in defendant in error's favor for $500. The trial judge suggested a remittitur of $350, which was accepted by defendant in error under protest, and judgment was entered in her favor for $150 and costs. On appeal the court of civil appeals affirmed this judgment. The case is now before us on the writ of *certiorari* to that court.

We shall state three of the errors assigned. They are as follows: ''(1) That there was no evidence to sustain the verdict; (2) that the court committed error in his general charge, by saying to the jury that the

138 Tenn.—16

railway company would be liable regardless of whether the conductor had authority to make a contract or not, provided it was within the apparent scope of his authority; (3) that the trial court was in error in his general charge in determining for them, as a matter of law, that if they should find that defendant in error boarded the train at the place where there was no ticket agent, and stated to the conductor that she wanted to go to Clearfield and back, and the conductor accepted the pay which she gave him, that that would constitute a contract.''

The charge of the court upon the subjects mentioned by the second and third errors assigned was in the following language:

''In this case I instruct you, gentlemen, that if you should find by the weight or preponderance of the evidence in the case that this plaintiff, Eva Pickle, boarded the train of the defendant at Eagen, at a place where there was no agent or ticket office, and said to the conductor that she wanted to go to Clearfield and back, and offered him twenty-five cents with which to pay her fare to Clearfield and back, and the conductor accepted the twenty-five cents out of which to pay the fare to Clearfield and return to Eagen, and gave her back five cents in change, that such act upon the part of the conductor would be within the apparent scope of his authority as conductor of the train. And if you should find from the weight of the evidence that after so accepting the twenty-five cents to pay the fare from

Eagen to Clearfield and return, that on the return journey he failed to carry her, but ejected her from the train by reason of her failure to pay an additional fare; that then the defendant company in this case would be liable for damages to the plaintiff, and that it would be so, gentlemen, in this case regardless of whether the conductor had authority from the railroad company to make such an arrangement, because, regardless of whether he had that authority or not, his act would be within the apparent scope of his authority as conductor of the train.''

The quotation just made from the charge bears on all matters covered by assignments Nos. 1, 2 and 3.

The whole controversy may be disposed of by a consideration of the first assignment, but inasmuch as the excerpt from the charge shows the point of view of the trial court and the court of civil appeals, the latter of which courts held there was no error in the charge, we have set it forth along with the assignments based on it, and we shall consider all of the assignments together, because they present, in substance, the same questions.

These questions are: What is meant by the apparent scope of an agent's authority? Was it correct for the trial judge to instruct the jury that the facts proven in the record brought the case within the apparent scope of the conductor's authority? or should he have left this matter to the jury after defining what is meant by the term?

What is meant by the term "apparent scope of an agent's authority," in the abstract, is a question of law, a matter of definition, for the court. Whether facts testified to by witnesses in a given case exhibited a claim or assertion of authority, by one as the agent of another with the consent or through the sufferance of that other is a question of fact; also whether the power asserted by conduct is a reasonable inference from express powers proven; both matters for the jury. The trial judge took both from the jury, and so invaded the province of that tribunal. However, in considering the first error assigned, to the effect that there is no evidence to sustain the verdict, we must treat the case as if the trial judge had correctly charged the jury, and then decide the question of law as to whether all of the evidence construed in a way most favorable to defendant in error raises a legal liability against the plaintiff in error.

We are of the opinion that the facts stated do not raise such liability. An agent's express authority is that which the principal gives to him in direct terms, either orally or in writing; implied authority embraces all powers which are necessary to carry into effect the granted powers, in order to make effectual the purposes of the agency.

Apparent authority is thus defined in a recent very able work in the following language:

"While as between the principal and the agent the scope of the latter's authority is that authority which

is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof, and as between the principal and third persons their mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal holds the agent out as possessing, or which he permits the agent to represent that he possesses, and which the principal is estopped to deny, and the principal will be bound by all acts of the agent performed in the usual and customary mode of doing the particular business, although he may have acted in violation of private instructions, unless there is something in the nature of the business or the circumstances of the case to indicate that the agent is acting under special instructions or limited powers. This rule applies whether the agency is a general or special one.'' 2 Corpus Juris, 570-573.

Again: Under the subtitle of ''Apparent or Ostensible Authority,'' it is said:

''Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such

authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority. Id., 573, 574.

"The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent." Id., 574, 575.

But, further:

It is essential to the application of the general rule of liability, stated, "that the person dealing with the agent was aware of the principal's acts from which the apparent authority is deduced, and that he dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence." Id., 575.

The facts which we have stated fail to measure up with the rules stated, in several particulars. Not only is there a failure to show that the plaintiff in error had knowledge of any similar act on the part of the conductor, that is, permitting passengers to pay him on a going trip the cash fare, and, at the same time, a return cash fare, but there is no evidence to show that the conductor had ever, in fact, acted in a similar way on any other occasion, or that he had ever been held out as having that authority by the plaintiff in error; and, of course it is not shown that defendant in error relied upon any such former acts. In addition, it appears that she knew there was a ticket office at Clearfield, and that the custom of the business was for people to buy a ticket before entering the train. The mere fact that the conductor had the right to accept cash fares on an outgoing trip by no means included the right at that time to accept fares for the return trip from any station on the road. The act of receiving return fares at such times could not be treated as within the scope of his duty to receive outgoing fares. The impropriety of such a course of action is obvious. Not

only would the duties of the conductor in managing the train be very much delayed and impaired by the inevitable controversies that would arise with numerous passengers from time to time, as to whether they had paid such fares, but a great door of fraud would be opened. It would be easy for designing persons, under such a rule, to pretend that they had paid the conductor, and even to secure confederates who would endeavor to substantiate their claims, resulting in their ejection from the train. So, many groundless lawsuits would be instituted against passenger carriers, and with little opportunity of a successful defense. It would also afford a golden opportunity for corrupt conductors to accumulate money at the expense of their employers. Certain it is that no board of directors, or other authority of a railway company, in their right senses, would, for a moment, think of permitting such a course of conduct. No legislature would enact a law making such a requirement of the passenger carriers of the State; nor can this court, by construction, create such a rule for the guidance of the railroads and the public.

From the foregoing considerations it is apparent that there is no evidence to support the verdict of the jury, that the judgment of the court of civil appeals and the trial court must be reversed, and the cause remanded for further proceedings.