**SOUTHERN RAILWAY COMPANY,**
Appellant,

v.

**Willie Sula Brown JONES, Appellee.**
**No. 12429.**

United States Court of Appeals
Sixth Circuit.

Dec. 17, 1955.

---

5.  Johnson v. Business Men's Assurance Co., 1951, 38 Wash.2d 245, 249, 228 P.2d 760, 762.

204

Clyde W. Key, Knoxville, Tenn., for appellant.

John H. Doughty, Knoxville, Tenn., Hodges & Doughty, Knoxville, Tenn., on brief, for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The widow of Ishmael C. Jones brought an action on behalf of herself and two minor children against the appellant Southern Railway Company for damages for its negligent acts in causing the death of her husband. The jury awarded her a verdict of $40,000 and the United States District Court entered judgment thereon for that amount.

The decedent, Jones, was killed on September 19, 1953. On that date, he was in the employ of Dunn Brothers, Inc., sub-contractor under Engineering Construction Company, prime contractor with the East Tennessee Natural Gas Company which was laying a pipe line in Eastern Tennessee. Dunn Brothers was engaged in unloading pipe from freight cars brought in by the Southern Railway Company and in transporting the material to the construction site.

In the progress of laying the pipe, a place for unloading and storing had to be procured near Jefferson City, Tennessee, some thirty miles east of Knoxville. Permission was obtained from the American Zinc Company to use its privately owned (Mossy Creek) spur track, situated not far to the east of the railroad's depot at Jefferson City. Simultaneously, land was leased from an abutting property owner for the storage of the pipe between the time it was unloaded from the freight cars and the time it was needed at the construction site. In the contract between the zinc company and

the Southern Railway Company, it was provided that the latter should have entire control of the industrial tracks and their operation, and might also use the tracks for the business of third persons.

Gordon Wolfe, a field man employed by the East Tennessee Natural Gas Company, went to Jefferson City two or three weeks before the fatal accident. His visit was concerned with the shipment of pipe for use in the construction of the pipe line. The first Southern Railway employee whom he met at Jefferson City was Dana Lauderback, who had worked for the Southern for 37 years, starting when he was only fourteen years old. During his entire service with the Southern he had been classified as a "trucker." Wolfe discussed with Lauderback possible unloading points. Two places were recommended, one of which was the spur track upon which the accident later occurred. Wolfe passed along the information to Engineering Construction Company, which thereupon leased land adjacent to the spur track for unloading purposes.

Upon instruction of the Engineering Company, the Southern "spotted" ten loaded cars at the designated place on the morning of September 10. These cars were unloaded on Saturday, September 12, when the Southern removed with a switch engine the empty cars and spotted ten additional loaded cars at the unloading point. Dunn Brothers had notified Southern that it intended to unload pipe on Sunday, September 13, and had requested that a sufficient number of loaded cars be placed on the Mossy Creek spur above the unloading point. Dunn Brothers was advised by Southern that no switching or spotting service could be furnished on Sunday, as no switch engine or crew would be available; but, late Saturday evening, Southern filled with loaded cars the space opposite ten unloading bins and placed eight additional cars above them.

On Saturday, September 12, Herbert G. Taylor, General Superintendent of Dunn Brothers, conferred with the Southern's Jefferson City station agent, who, in replying to Taylor's protest that if the cars were not unloaded on Sunday demurrage would accrue, said: "Well, we will help you any way we can." He stated that Dana Lauderback, who lived on a nearby hill, could be found at his home always, that Lauderback knew quite a bit about practices around the depot and yards and would help in any way he could. The station agent pointed to where Lauderback lived.

Of the eighteen loaded cars placed by Southern on the industrial siding, ten cars were unloaded on the morning of Sunday, September 13. While the cars were being unloaded, Lauderback came to the project site around eleven o'clock, A. M., and inquired of Kelly, crane operator of Dunn Brothers, as to when the cars then being unloaded would be ready to be moved. He was told that the cars would be ready for movement around two o'clock in the afternoon. Lauderback said that he would come back at that time and help move the cars. He kept his word and assisted in moving the ten empty cars on the industrial track so that there would be room for lowering the remaining eight cars for unloading.

Lauderback released the air brakes on the ten empty cars, then applied a railroad jack to start that cut of cars down the industrial track. To warn persons traveling on the highway, he instructed the workmen to station themselves at the highway crossing over which the railroad cars would necessarily pass. After the cut of ten empty cars had been removed, Lauderback, using a railroad jack, started two cars of the remaining eight and moved them to an appropriate place for unloading. In like manner, he moved three of the six cars left to a point some ten feet from the first two cars which had been spotted. He had been told by Kelly, the crane operator, that the last three cars would not be needed, as five cars were all that the crew could unload. Lauderback insisted that the remaining three cars should be moved from their location on the industrial siding near the main line, for the reason that the brakes might not hold

the cars in the position in which they were sitting and that they might roll downgrade.

Lauderback placed himself at the back brake of the last of the three cars and, according to Kelly, turned the cars loose "before we could get there." Some of the workmen jumped upon the rolling cars, however, and unsuccessfully attempted to apply the brakes. Lauderback jumped off before they did, according to several witnesses, although he denied that he had done so.

These last three cars, from force of gravity, moved with increasing speed, out of control, and struck the three cars which Lauderback had spotted together knocking them into the two cars farthest downgrade which he had first spotted. Appellee's decedent was working on one of these cars farthest downgrade and, from the impact, was thrown from the car and so severely injured that he died soon after the accident.

Twenty-six witnesses testified at the trial. To detail the testimony of only those witnesses who were at the scene of the accident would be unnecessarily cumbersome, in view of the concession of appellant that there is sufficient evidence to sustain the jury verdict that the negligence of Dana Lauderback contributed to the fatal accident. There is substantial evidence that his negligence was the proximate cause of the accident. Southern states in its brief that the "ultimate question for determination is whether the doctrine of *respondeat superior* is applicable so as to render appellant liable for Lauderback's negligence." The railroad insists that Lauderback was not acting within either the *actual* or the *apparent* scope of his employment.

Inasmuch as jurisdiction of this case rests upon diversity of citizenship, Tennessee must supply the governing law. In the first case which appellant cites, Goodman v. Wilson, 129 Tenn. 464, 166 S.W. 752, 51 L.R.A.,N.S., 1116, the defendants were held liable under the doctrine of *respondeat superior* for the negligence of the driver of an automobile owned jointly by defendants. This case, and Core v. Resha, 140 Tenn. 408, 412, 204 S.W. 1149, the second case cited by appellant, are merely authority for the recognized proposition that for the doctrine to be applicable, a servant must have been engaged upon his master's business at the time of the accident and must have been acting within the scope of his employment. Terrett v. Wray, 171 Tenn. 448, 451, 105 S.W.2d 93, 94, emphasized by appellant, is to the same effect, but the opinion in that case makes it plain that "whether a case falls within the rule of liability under these general well-settled principles affords great variety of application, considered in its surroundings and with its background of time, place, and circumstance." The facts of that case are far afield from those encountered here, in that there the son of an automobile owner had been sent by her to a schoolhouse to pick up some of her other children, together with children of neighbors. The boy mischievously wired one of the door handles of the car to a battery in such fashion that anyone grasping the door handle would receive an electric shock. The plaintiff who received a shock sued the boy's mother, but the Supreme Court of Tennessee held against recovery upon the ground that the boy was not acting within the scope of his authority. The difference between that case and the instant one is the difference between intended mischief and intended benevolence.

Appellant's citation of Cunningham v. Union Chevrolet Co., 177 Tenn. 214, 219, 147 S.W.2d 746, 148 S.W.2d 633, would not seem to strengthen its theory as the facts there are totally different from those presented here. In the cited case, it was held that there was insufficient evidence to submit to the jury upon the question of whether the agent of an automobile dealer was acting for his employer when he became involved in an automobile collision while returning with companions from a roadhouse after midnight. The theory that he was demonstrating the automobile to his companions would not stand up. Chief Jus-

tice Green declared that the trip of the employee to the country was for the employee's own pleasure, and that his trip back to the city was for his own purposes; that he had not detained his companions at the roadhouse to try to sell them an automobile, nor had he brought them back to town for the purpose of demonstrating it.

Deihl & Lord v. Ottenville, 82 Tenn. 191, merely recognizes and applies the general principle that, while the master is liable for the acts of his servant done within the scope or course of his employment, he is not responsible for such wrongful conduct of the servant as he had neither directed, authorized, nor expected the servant to do. See also Kelly v. Louisiana Oil Refining Co., 167 Tenn. 101, 103, 66 S.W.2d 997.

In the most recent Tennessee authority cited by appellant, Jones v. Agnew, 197 Tenn. 499, 274 S.W.2d 825, the holding was that the owner of an undertaking establishment was not liable for the negligence of one of his employees in causing a fatal accident while driving, *contrary to instructions,* the employer's ambulance. The employee had been given a job under the G. I. Bill of Rights to learn embalming, to help keep the place of business clean, and to answer the telephone. He had been instructed specifically not to drive any vehicle belonging to the establishment. The mere statement of these facts distinguishes the case.

In support of its argument that Dana Lauderback was not acting within the *apparent* scope of his employment, appellant urges that the opinion of the Supreme Court of Tennessee in Southern Railway Co. v. Pickle, 138 Tenn. 238, 244–248, 197 S.W. 675, is conclusive of the instant case. There, it was held that the evidence was insufficient to show that it had been within the apparent scope of the authority of a railway conductor to collect in cash a return fare where he had the right to accept a cash fare on the "going" trip from a station which had no ticket agent and he had, in fact, accepted such fare. The plaintiff testified that the conductor had represented to her that the twenty cents which she paid him on her "going" trip covered her return transportation, the regular fare between the two points being ten cents each way. There was a ticket office at the station where she boarded the train for her return trip. She sued the railroad company for damages for ejecting her from the train, but the Supreme Court reversed the verdict of the jury in her favor, which had been upheld by a distinguished former Chief Judge of this court, when he was a Tennessee trial judge. Later, when a member of this court, Judge Hicks cited the Tennessee case as authority for the proposition that an agent cannot establish his agency by his own acts or declarations. Ohio Boulevard Land Corporation v. Gregory, 6 Cir., 46 F.2d 263, 265. There can be no quarrel with this doctrine.

In a recent Tennessee case, Anderson v. Covert, 193 Tenn. 238, 245 S.W.2d 770, 771, Mr. Justice Gailor quoted with approval from Terry v. Burford, 131 Tenn. 451, 468, 175 S.W. 538, 542, L.R.A.1915F, 714, which quoted the following language of Mott v. Consumers' Ice Co., 73 N.Y. 543: " ' "The rule recognized in all the recent cases, and which does not materially conflict with any of the older decisions, although it may qualify some of the intimations and casual expressions or illustrations of the judges, is that for the acts of the servant, within the general scope of his employment, while engaged in his master's business, and done with a view to the furtherance of that business and the master's interest, the master will be responsible, whether the act be done negligently, wantonly, or even willfully. In general terms, if the servant misconducts himself in the course of his employment, his acts are the acts of the master, who must answer for them." ' " Anderson v. Covert, 1952, 193 Tenn. 238, 241, 245 S.W.2d 770.

The Court of Appeals of Tennessee, Western Section, in Pratt v. Duck, 28 Tenn.App. 502, 512, 191 S.W.2d 562, 566, said that the "master's liability does not

cease merely because a servant is acting contrary to or even in defiance of express instructions from the master but only when the servant has abandoned and turned aside completely from the master's business to engage in some purpose wholly his own." See also Hall Grocery v. Wall, 13 Tenn.App. 203, 207.

In Eichengreen v. Railroad, 96 Tenn. 229, 235, 236, 34 S.W. 219, 221, 31 L.R.A. 702, Mr. Justice McAlister quoted from Wood on Master and Servant, as follows: "It is not necessary, in order to fix the master's liability, that the servant should, at the time of the injury, have been acting under the master's orders or directions, or that the master should know that the servant was to do the particular act that produced the injury in question. It is enough if the act was within the scope of his employment, and, if so, the master is liable even though the servant acted willfully and in direct violation of its orders. A master cannot screen himself from liability for an injury committed by his servant within the line of his employment, by setting up private instructions or orders given by him and their violation by the servant. * * * The master can never escape liability for an abuse of an authority by the servant; therefore, the question always is whether there was any authority, express or implied, on the part of the servant to do the act."

The issue here is whether, as a matter of fact, Dana Lauderback acted within the scope of his actual or apparent authority. That question was for the jury. See Southern Railway Co. v. Pickle, 138 Tenn. 238, 244, 197 S.W. 675. If there was substantial evidence to sustain the verdict of the jury which obviously rested upon a finding that Dana Lauderback was acting within the actual or apparent scope of his authority, the jury verdict must be upheld, unless either the charge of the court, or its rulings upon the admission or exclusion of evidence, was prejudicially erroneous.

Admittedly, three people were employed at the station of appellant in Jefferson City, Tennessee, at the time of the accident: Jennings, who was acting temporarily as station agent in the absence of the regular agent, Hickey, who was ill; Stanberry, designated as operator; and Dana Lauderback. The superintendent of the Knoxville Division testified that these three men were "performing the necessary duties for the Southern."

Dana Lauderback was called to the witness stand by appellant. He testified that he worked from eight o'clock in the morning until five in the afternoon. He would go to the warehouse, check cars, and unload baggage from Southern trains; occasionally he would spot cars at the station, and often would tell a conductor where to spot cars. He had at times even uncoupled freight cars. He asserted, not too modestly: "I know pretty well about everything around there." He declared that he did about everything that needed to be done for the railroad in Jefferson City, other than bookkeeping, serving as telegraph operator, or typing correspondence. He stated that he had been so acting since 1916.

Lauderback testified further that, prior to the date of the accident, he had ridden engines on the Mossy Creek spur track and had assisted in spotting cars there. He stated that he did a "little of everything that was to be done"; and that the relief agent depended upon him to do the work which the agent should have known about but did not. Asked whether he was trying to protect the property of the Southern, he replied: "Yes, sir, and some more people. Somebody might get hurt." He testified further that, when representatives of the the Engineering Construction Company called upon the temporary station agent to arrange for the unloading of pipe, the agent had told them: "I'm just an extra man here. I don't know. Maybe Dana can tell you where there is a place."

When Gordon Wolfe was testifying concerning the activities of Lauderback on September 13, he was questioned facetiously concerning Lauderback's apparent authority. He was asked: "Did you think he was president of the company?" Wolfe answered that the Southern Rail-

road man created that impression at times. Asked whether there was confusion in his mind as to whether Stanberry or Lauderback was agent in charge of the station, Wolfe replied, "there still is." He modified this statement, however, by saying that he did not think Dana was in charge; that he had no way of knowing what Lauderback's job actually was; but that nobody connected with the Southern ever told him that Lauderback had no authority to spot cars or to work on Sunday.

Clarence Cooper, who worked for the East Tennessee Natural Gas Company, testified that while the loaded cars were being moved on the afternoon of September 13, he heard Lauderback tell Kelly that he had to move the last three cars, as their brakes might not hold during the night and that the cars might roll down the track, hit the other cars and shove them into the highway. Asked if he thought Lauderback were president of the Southern or agent in charge of the office at Jefferson City, this witness replied: "I knew he had a pretty good pull there. Had quite a bit of authority, or he wouldn't have been out there." He said that Lauderback was the only person who directed car movements on the fatal Sunday. The testimony of Cooper was corroborated in material details by Taylor Carson and Bill Brown, both employees of Dunn Brothers.

Schultz, a flagman for the Southern, testified that Lauderback rode the switch engine when cars were being spotted on the industrial track on September 12, and after talking to the job foreman had told Schultz how the cars were to be spotted on the siding.

Superintendent McNutt of the Knoxville Division testified that the arrangement for spotting cars on the industrial track could be made with the Jefferson City "agent", or in some cases with the "operator." As has been shown, the business at Jefferson City was so conducted that both Wolfe and Cooper were not quite sure whether at the time of the occurrences in controversy Lauderback was the agent or operator, inasmuch as so many functions in behalf of the Southern were performed by him.

Stanberry, agent-operator of appellant at Jefferson City, on cross-examination said that Lauderback—though he had been told not to do so—had gone out on industrial tracks in connection with spotting railroad cars. He stated that his impression was that Lauderback "does anything and lots of things maybe that he is not supposed to do to expedite his railroad." He added that Lauderback loves the railroad, and "works for his company."

In our judgment, the evidence which has been reviewed required submission to the jury, under appropriate instructions, of the question whether at the time of the fatal accident Lauderback was acting within the scope of his actual or apparent authority. In the light of the testimony, appellant was not entitled to a directed verdict upon that issue.

The appellee urges the added ground of liability to be that appellant was negligent in furnishing railroad cars with defective brakes, and that such negligence combined with the negligence of Dana Lauderback as a proximate cause of the injury and resultant death of appellee's decedent.

In Nashville, C. & St. L. Ry. Co. v. Myers, 137 Tenn. 142, 147, 192 S.W. 168, 169, the Supreme Court of Tennessee said: "The principle underlying the liability of the railway company to the employe of a shipper for negligence of the railway company in furnishing a defective car which injures the employe is that the railway company is held to have selected the car and to have furnished it as a fit instrumentality for the purpose of shipping the goods to be loaded in it, and any defect existing which results in injury to those engaged in loading it is attributable to the negligence of the railway company in failing to inspect the car and discover and remedy the defect."

The Southern had spotted the runaway cut of three cars upon an incline, subjecting them to the force of downgrade gravity. Lauderback, in the pres-

ence of several witnesses, told Kelly, the crane operator of Dunn Brothers, that the cars would not be held by the brakes at the place where they had been spotted. According to the testimony of the witnesses, Kelly, Rollins, Wolfe, Cooper and Carson, the application of the brakes on the cut of three cars did not prevent the cars from running away.

After the accident, the brake shoes and the braking mechanism on the cars was examined by several witnesses who were working on the job with the decedent. Kelly testified that the brake shoes on the cars were "worn mighty bad." Rollins declared under oath that he examined the brake shoe on the last car—where it fits on the wheel—and that "the brake shoe wasn't even against the wheel at all"; that daylight could be seen between the brake shoe and the wheel. Carson swore that the brakes looked to him as if "they were worn pretty bad"; and that, upon being turned, the brake wheel on the last car, on which Lauderback was riding, would not catch. The testimony of these witnesses, being substantial evidence that appellant furnished cars with defective brakes, warranted submission to the jury of the question whether appellant was negligent in this aspect.

Appellant assigns error upon the charge of the court in several aspects, and also charges error in the denial by the court of five of its special requests. The trial judge delivered comprehensive instructions, in which he elucidated to the jury the applicable principles of Tennessee law and properly left to the jurors determination of the fact issues.

Appellant insists that the district court should have sustained its objection to that portion of the charge in respect of intervening cause and cites as authority Moody v. Gulf Refining Co., 142 Tenn. 280, 290, 218 S.W. 817, 8 A.L.R. 1243. There, the Supreme Court of Tennessee stated the doctrine that where the facts of a particular case are uncontroverted so that only one inference can be drawn, it is a question of law whether there was a sufficient intervening cause to prevent the defendant's act from being the proximate cause of an injury. The facts of the case were that, during the absence of an employee of the defendant who had unloaded a tank car, some boys threw lighted matches into pools of gasoline on the ground, occasioned to be there as the result of the unloading of the tank car. The defendant's employee did not know that the boys had matches. A fire was started, and plaintiff's building was burned. It was held that the act of the boys in throwing the matches was an independent, intervening cause for which the defendant would not be liable, even though it had been negligent in permitting the gasoline to escape from the tank car.

The difference between that case and this is that, here, the appellant knew that the loaded cars had to be moved in the process of unloading them. The cut of cars, when spotted on an incline, was potentially dangerous to workmen. Whether the cars were released by Lauderback or others, the release of the brakes and the movement of the cars was something which the jury could reasonably find should have been anticipated by appellant. Here, Lauderback intentionally released the brakes. In the Moody case, the defendant's employee did not even konw that the boys had matches with which to cause the trouble.

In considering the defense of intervening cause, two cases, namely, Gatlinburg Construction Co. v. McKinney, 37 Tenn.App. 343, 263 S.W.2d 765, certiorari denied Dec. 11, 1953 and Verran v. Town of Greeneville, 4 Tenn.App. 422, held that the actions of the respective children should have been anticipated by the defendants. Here, in the circumstances of the case, appellant could reasonably be held bound to have anticipated probable injury when it placed defective cars upon the industrial siding. Clearly, a question of fact for the jury was presented.

After carefully explaining that a defendant is not relieved of liability where the negligence of a third party may reasonably have been anticipated or fore-

seen as a contributing factor, and that an intervening cause does not break the chain of original causation if it were foreseeable that some intervening cause could join forces with the original negligence of the defendant to produce harm, the United States District Judge instructed the jury as follows: "It was the duty of the railroad in spotting the cars to exercise ordinary care to leave them in such condition that they would not, by reason of defects in the cars or precariousness of their position, be of potential danger to plaintiff's intestate—that is the deceased in this case—or others engaged in unloading operations in the cars farther down hill. If it was reasonably foreseeable that original negligence, if any, existing in the form of defects or dangerous location, would result in injury, either directly through such defects or location, or as a result of intervening action from some third party, the fact that a third party negligently intervened would not relieve the railroad from liability for its original negligence, if it was originally negligent." In our judgment, the court correctly charged the jury with respect to intervening cause.

■ Appellant contends that the court should have sustained its objection to that portion of the charge wherein the jury was instructed in effect that the master may not escape liability where the act of the servant is done for the master's benefit. The excerpt of the court's charge said to be erroneous is set out in the margin.[1] To do justice to the charge upon this aspect of the case, the two paragraphs following those of which complaint is made should be considered. Paragraphs lifted from a charge for critical purposes are often confusing or misleading. Correctness of a charge should be measured always by the entire charge upon the subject matter and not by isolating particular paragraphs from the context. Immediately following the language quoted in the marginal footnote, the judge charged the jury as follows:

"I charge you that a master will be liable for the acts of the servant, within the scope of the employment, whether the acts are expressly or impliedly authorized, and whether his authority is real or merely apparent, and whether the servant receives compensation for his activities, or not, is not controlling.

"I further charge you that if you find from a preponderance of the evidence in this case, that Dana Lauderback acted within the general scope of his employment, and engaged in his master's business, and did this with a view to the furtherance of that business, the defendant is responsible for his actions, whether the actions of Lauderback were negligent, wanton, or wilful. In other words, if the servant misconducts himself in the course of his employment, his acts are

---

1. "A master, however, is not permitted to escape liability by saying, 'I did not tell him to do that.' Where the relation of master and servant exists and the act of the servant is done for the benefit of the master and is in line with his employment, it is in law the act of the master. That it may have been done during off hours, or even contrary to instructions, it is still the act of the master if done for the master's benefit and is in the general nature of the work for which the servant was employed.

"Conversely, the master is not liable for acts of the servant done for his, the servant's own benefit, or for a purpose foreign to his, the servant's employment and not for the benefit of the master.

"It is material, therefore, for the jury to inquire into the purpose of the employee's actions on the occasion in question, which employee, according to the undisputed proof is Dana Lauderback; also, what prompted him to act as he did on the occasion in question, whether he was asked to release the cars and, if so, who asked him; also, whether at the time he had loaned his services to some third party and wholly for some third party's benefit; or, whether he was engaged in something for the benefit of his employer, Southern Railway Company, as well as of a third party. These observations, ladies and gentlemen of the jury, relate to evidentiary facts. The ultimate and decisive facts necessary to liability have been stated, namely, performance of a service for the benefit of his employer and a service within the general nature of the work he was hired to do."

the acts of the master who must answer for him."

█ Under the Tennessee authorities heretofore cited and discussed, we think the foregoing paragraphs immediately connected with and in sequence to the statements of law embraced in the paragraphs quoted in the foregoing footnote constituted, in entirety, a correct charge upon the subject matter.

Appellant assigns error upon the denial of five requests to charge which it tendered to the court.[2] The first of these requests is said to have been taken al-

**2.** Defendant's Special Requests.

No. 1. (Refused except as covered). "I further instruct you that if you should find the death of Mr. Jones resulted proximately from the negligence of Dana Lauderback, nevertheless the plaintiff would not be entitled to recover from Southern Railway Company unless and until the plaintiff has shown by a preponderance of the evidence that the relationship of master and servant existed between Southern Railway Company and Dana Lauderback at the very time and in respect of the very transaction out of which the death of Mr. Jones arose. The mere fact that Dana Lauderback was in the general employ of Southern Railway Company is not sufficient to make the defendant liable. It must be further shown that at the time of the accident Dana Lauderback was on his master's business and acting within the scope of his employment."

No. 2. (Refused). "Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such authority as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority."

No. 3. (Refused). "The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent. It is essential to the application of the general rule of liability stated, that the person dealing with the agent was aware of the principal's acts from which the apparent authority is deduced, and that he dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence."

No. 4. (Refused except as covered). "The limitations of an agent or of a servant's authority depend generally upon the things he is doing, the object of his set to accomplish, the degree of discretion which the position where he is placed, and the exigencies of the occasion reasonably called for. The act for which the principal is liable must be something incidental to the employment for which the agent is employed and which it is his duty to perform. To render the principal liable the act must pertain to the particular duties of the employee. The principal cannot be made liable for acts which the agent volunteers to do for him beyond the scope of his employment."

No. 5. (Refused). "I further instruct you that under the undisputed proof in this case the defendant, Southern Railway Company, had been engaged to perform only what is known as the 'line haul' with respect to the freight cars consigned to East Tennessee Natural Gas Company that have been referred to in this case. That 'line haul' service was completed by Southern Railway Company

most verbatim from the opinion in Goodman v. Wilson, 129 Tenn. 464, 467, 166 S.W. 752, 51 L.R.A.,N.S., 1116; and the next three requests are said to have been predicated upon Southern Railway Company v. Pickle, 138 Tenn. 238, 197 S.W. 675, supra.

The court had charged the jury that the "master is not liable for the acts of the servant done for his, the servant's own benefit, or for a purpose foreign to his, the servant's employment and not for the benefit of the master"; and had told the jury that the "ultimate and decisive facts necessary to liability have been stated, namely, performance of a service for the benefit of his employer and a service within the general nature of the work he was hired to do." This, we think, was a correct statement of the law. The requested instruction did not contain the necessary qualification concerning Lauderback's acting within the *apparent* scope of his authority and, moreover, might have been considered by the jury as exonerating appellant from liability, despite its negligence, if any, in furnishing railroad cars having defective brakes. It is not reversible error for a judge to decline to give a special instruction which is not strictly accurate. Tevis v. Proctor, etc., 21 Tenn.App. 494, 505, 113 S.W.2d 64; Morris v. Bolling, 31 Tenn.App. 577, 586, 218 S.W.2d 754. It is well settled that to put a trial court in error for declining to grant a special request, the proffered instruction must be accurate in every respect. City of Knoxville v. Cox, 103 Tenn. 368, 372, 53 S.W. 734, 735; City of Knoxville, Tennessee, v. Bailey, 6 Cir., 222 F.2d 520, 530.

Appellant does not elaborate upon the specific errors claimed to inhere in the failure of the court to grant its specific requests, 2, 3, and 4, but rests generally upon the principles of the authoritative source upon which the instructions were based: Southern Railway Co. v. Pickle, 138 Tenn. 238, 197 S.W. 675. Indeed, in the trial court, appellant did not detail errors claimed in the refusal of the trial court to give the requested instructions. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A. provides that error may not be assigned upon the giving or failure to give an instruction, unless the party objects before the jury retires to consider its verdict and states distinctly the matter to which objection is made and *the grounds of the objection*. Waiving aside this requirement, however, we think the doctrine of "apparent scope of authority" was adequately and correctly covered in the general charge. It has been held repeatedly in Tennessee that it is not error to deny a special request the substance of which has been covered in the general charge. White v. Seier, 37 Tenn.App. 437, 264 S.W.2d 241, 247, certiorari denied by Tennessee Supreme Court; City of Knoxville, Tennessee, v. Bailey, 6 Cir., 222 F.2d 520, 530.

In no aspect does it appear that the refusal of the trial judge to give the special instructions requested by appellant constituted prejudicial error. In Hoag v. City of Detroit, 6 Cir., 185 F.2d 764, 766, this court said that "no error or defect in any ruling or order, or in anything done or omitted by the trial court is ground for disturbing a judgment, unless refusal to take such action appears to the court

when it placed those cars upon the Mossy Creek or Jarnigan spur track near Jefferson City, Tennessee, at a place designated by or acceptable to East Tennessee Natural Gas Company or its agents. After such placement, the defendant Southern Railway Company was under no legal obligation to further shift or 'spot' said cars for unloading unless its services were specially engaged therefor and an extra charge made by it and paid or secured by the consignee. In the absence

of such special engagement and the payment of additional compensation, any subsequent switching or spotting of said cars after their delivery upon said track would have been a preference under the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.], and a violation of Federal law on the part of both Southern Railway Company and the East Tennessee Natural Gas Company and its agents or subcontractors participating therein."

inconsistent with substantial justice. Federal Rules of Civil Procedure, Rule 61, 28 U.S.C.A. See Gillis v. Keystone Mutual Casualty Co., 6 Cir., 172 F.2d 826, 11 A.L.R.2d 455." See also Dallas Ry. & Terminal Co. v. Sullivan, 5 Cir., 108 F.2d 581, 584.

■ Viewing the record as a whole, we think that there was substantial evidence in the circumstances disclosed to support a finding that appellant held out Lauderback as clothed with apparent authority to attend to spotting its railroad cars on the date of the accident.

■ We think the trial court was right in refusing to grant appellant's Special Request No. 5, which embraced only a part of the evidence and omitted other evidence which, if believed, warranted the jury's finding for the plaintiff.

The instruction, if granted, would have been misleading, in that it disregarded substantial evidence introduced by the plaintiff. To have given the request would have constituted an invasion by the judge of the province of the jury.

■ Finally, appellant urges that the district court should have withdrawn from consideration of the jury the allegation of negligence upon the part of appellant with respect to defective brakes. From the preceding review of the evidence concerning the brakes, it is obvious that there was substantial evidence that appellant furnished cars with defective brakes for necessary use by the workmen, including the decedent, in their unloading operations. It would have been an erroneous ruling had the trial court declined to submit the issue of defective brakes for the consideration of the jury. The issue for a reviewing court is not whether the judges, had they been members of the jury, would have agreed to the verdict; but whether, in finding their verdict, the jurors acted unreasonably and arbitrarily. City of Knoxville, Tennessee v. Bailey, 6 Cir., 222 F.2d 520, 525, citing Tennessee authority.

■ In this case, we are of opinion that there is no showing of unreasonable

or arbitrary action on the part of the jury. Their verdict was supported by substantial evidence and was reached under correct instructions as to applicable law.

Accordingly, the judgment of the district court is affirmed.