# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

OLAN ENGLAND and
ROBERT WHITLEY,

       Plaintiffs/Appellees,

VS.

SELECT SIRES, INC., P. D. LIGGETT,
and TENNESSEE ARTIFICIAL
BREEDING ASSOCIATION,

       Defendants/Appellants.

)
)
)
)
) **Giles Circuit No. 2142**
)
) **Appeal No. 01A01-9705-CV-00204**
)
)
)
)
)
)
)

FILED

June 12, 1998

Cecil W. Crowson
Appellate Court Clerk

APPEAL FROM THE CIRCUIT COURT OF GILES COUNTY
AT PULASKI, TENNESSEE
THE HONORABLE WILLIAM B. CAIN, JUDGE

**BILLY C. JACK**
Columbia, Tennessee
**DOUGLAS E. JONES**
Nashville, Tennessee
Attorneys for Appellant Tennessee
Artificial Breeding Association


**R. STEPHEN DOUGHTY**
**WEED, HUBBARD, BERRY & DOUGHTY**
Nashville, Tennessee
**WALTER W. BUSSART**
**BUSSART & MEDLEY**
Lewisburg, Tennessee
Attorney for Appellees

**REVERSED AND REMANDED**

                         **ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**HOLLY KIRBY LILLARD, J.**

One of the defendants, Tennessee Artificial Breeding Association ("TABA"), has appealed from a jury verdict in favor of plaintiffs, Olan England ("England"), in the amount of $77,840.54, and Robert Whitley ("Whitley") in the amount of $183,362, which the trial court reduced to $120,000 via a remittitur. TABA further appeals the jury verdict finding an ostensible agency relationship between TABA and artificial insemination technician P.D. Liggett ("Liggett").[1]

Although the parties raise seven separate issues,[2] we find the essential issues to be the following:

> I. Whether England's evidence as to damages was speculative; whether such evidence of lost profits constituted a sufficient basis for the jury's computation of damages.
>
> II. Whether Whitley's evidence as to damages was of such a speculative nature that a jury had no basis for its verdict.
>
> III. Whether the trial court erred in dismissing the cause of action by plaintiffs against TABA under the Tennessee Consumer Protection Act.
>
> IV. Whether the trial court erred in ordering a new trial as to Whitley unless he accepted a remittitur.

Select Sires, Inc. is a national federated cooperative engaged in the collection and distribution of semen from bulls whose offspring have a record of high milk production.

---

[1] Liggett was voluntarily dismissed from this action just prior to the commencement of trial.

[2] Tennessee Rule of Appellate Procedure 36(a) states:
> Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.

Furthermore, Rule 3(e) provides:
> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

In its motion for a new trial, defendant did not raise the issue of ostensible agency, nor did it raise the issue of Whitley's failure to produce certain documents referred to at trial. These failures constitute waivers of the issues on appeal. *See Mason v. Tennessee Farmers Mut. Ins. Co.*, 640 S.W.2d 561 (Tenn. Ct. App. 1982).

TABA is an association of dairymen who utilize artificial breeding in the management of their dairy herds. TABA purchases semen from Select Sires, Inc., and has the name "Select Sires, Inc.," printed on a breeding receipt which it furnishes to technicians who purchase semen from TABA.

Giles County Artificial Breeding Association ("GABA") is a former purchaser of semen and employer of Liggett, but it ceased operation in 1984 prior to the inception of this controversy.

England and Whitley are dairymen whose cattle have been artificially impregnated by Liggett for a certain period of time. They are members of Tennessee Artificial Breeding Association.

Liggett was formerly a salaried employee of GABA. Beginning in 1979, he continued his work of insemination "on his own," purchasing semen from defendant and others, selling it to cattle owners, and administering it to their cattle.

Select Sires, Inc., sold semen to defendant in individual injections called "straws." Each "straw" bore the name of the bull from which the semen was obtained.

TABA's principal customers were "technicians" who were trained to artificially impregnate cattle and who, in turn, sold the semen at a profit to the owners of cows which were impregnated by the technician.

TABA furnished to technicians various promotional paraphernalia bearing its imprint. It also furnished to technicians, including Liggett, a supply of printed forms entitled "breeding receipt."

The breeding receipts were printed for TABA at its expense and furnished in blank to the technicians to be filled in by them and delivered to their customers. Certain details

3

of the receipt are material to this appeal. At the top of the receipt in large print are the words, "Select Sires, Inc." Select Sires, Inc. did not authorize the inclusion of its name in the receipt which was composed and printed at the direction and expense of TABA. TABA used "Select Sires" as a trade name in its semen distribution business.

The receipt has a blank space for the name and number of the cow, the name and number of the bull, and the fee paid by the owner. In the lower part of the receipt is the following:

> I hereby certify that I am duly authorized by the above named business to issue this receipt in its name which is given as evidence of service rendered and also a certificate of date of service and identity of semen used for service of animal identified herein.
>
> _____  _____
>
> (Inseminator signature)        Tech. No.
>
> Tennessee Artificial Breeding Association

This form of receipt was uniformly filled in and delivered to both England and Whitley each time Liggett inseminated one of their cows.

Liggett purchased semen from defendant in certain quantities and maintained a reservoir of it for use as required by his customers. As reports were published on the "standing" or desirability of semen for various bulls, the demands of customers changed, and Liggett was left with a surplus of semen that was no longer desired by his customers. In order to avoid the loss of his investment in the semen which was no longer desired, he began to substitute the unwanted semen for the semen ordered by his customers.

In 1987, it came to light that Liggett was defrauding dairy farmers by accepting payment for higher priced semen while inseminating their cattle with a lower priced semen. Both England and Whitley fell victim to this fraud perpetrated by Liggett.

On November 13, 1987, TABA filed a suit against Liggett seeking to enjoin him from representing that he had a business relationship with defendant, from using breeding

4

receipts of defendant, and from destroying his records of inseminations. TABA further sued Liggett to recover damages that resulted from his fraudulent conduct. The affidavit of the general manager of TABA filed in that case states in part:

> On Wednesday, November 11, 1987, the Executive Committee met at our central office and the resulting action by the Board was to terminate our relationship with Mr. Liggett, effective immediately.
>
> Mr. Liggett still has receipt books and promotional material bearing the Association's name. It is my concern that he not continue to use these materials from this day forward in that he is no longer a representative of the Association. . .

TABA alleged, among other things, that Liggett's activities constituted violations of the Tennessee Consumer Protection Act, and that as a result of Liggett's actions, TABA had suffered damage to its reputation in Tennessee.

Around that same time, a letter was sent to all members of TABA on the letterhead of TABA's counsel, signed by the general manager of TABA and stating:

> Please be advised that as of November 11, 1987, Mr. P.D. Liggett's business relationship with Tennessee Artificial Breeding Association and Tennessee Select Sires, Inc. was terminated. . .

Thereafter, on March 12, 1988, England and Whitley filed a complaint against Liggett, TABA, and Select Sires. The complaint alleged, *inter alia*, that Liggett was acting as an agent of TABA when he fraudulently sold less expensive and inferior bull semen to England and Whitley. The second cause of action set forth in the complaint was premised on the Tennessee Consumer Protection Act. Specifically, England and Whitley alleged that defendants had engaged in unfair or deceptive trade acts or practices affecting the conduct of trade or commerce in violation of the Act. TABA filed an answer denying that Liggett was acting as its agent and denying that it had violated the Tennessee Consumer Protection Act.

Select Sires was dismissed prior to trial on order of the court, and Liggett was voluntarily dismissed as a defendant by the plaintiffs just prior to the commencement of

5

trial.

At the conclusion of the proof in this matter, TABA moved for a directed verdict and specifically moved for a directed verdict on the cause of action under the Tennessee Consumer Protection Act. The court granted a directed verdict with regard to the Tennessee Consumer Protection Act claim.

The case was presented to the jury which returned a verdict for both plaintiffs against TABA, awarding England $77,840.54 with prejudgment interest at a rate of 8% since November 11, 1987, and awarding Whitley $183,362.00 with no prejudgment interest.

After entry of the judgment by the court, TABA filed a Motion for a New Trial, Directed Verdict and/or Motion for Judgment Notwithstanding the Verdict. This motion did not raise the issue of liability but questioned only the jury's award of damages to plaintiffs and the admissibility of certain expert testimony regarding damages. England and Whitley filed Plaintiffs' Motion for the Court to Reconsider its Ruling on the Consumer Protection Act. The court entered an order on January 31, 1997, denying TABA's motion as to England in all respects and denying the motion by plaintiffs to reconsider the Tennessee Consumer Protection Act ruling. In that order, the court did grant a new trial as to Whitley unless he accepted a remittitur of all the verdict in excess of $120,000. Whitley accepted the remittitur under protest. TABA appealed to this Court.

As mentioned *supra*, TABA did not raise the issue of liability in its motion for a new trial as mandated by Tenn. R. App. P. 3(e). However, we feel compelled to digress for a moment to discuss liability.

The following issue was submitted to the jury with the response indicated:

Is Tennessee Artificial Breeding Association liable to plaintiff, Olan England? Yes

Is Tennessee Artificial Breeding Association liable to plaintiff, Robert Whitley? Yes

6

This general finding of liability must be sustained if the record contains material evidence of any relationship or actions alleged in the complaint which would impose liability upon the defendant for the wrongs alleged in the complaint. Tenn. R. App. P. 13(d).

There is no evidence that TABA ever expressly employed or authorized Liggett to act as its agent in respect to the sale or administration of artificial insemination. There is evidence that Liggett was expected to solicit memberships in the association, but the wrongs alleged by plaintiff were not committed in soliciting memberships. The testimony of defendant's general manager contains the following:

> A. Mr. Liggett was out there with bull books and receipts, and we certainly knew that he had them.
>
> Q. And showing that he was authorized to act on your behalf, right? Say it, Mr. Riley.
>
> A. It's written on the receipt.

The affidavit of the same general manager, quoted above, stated:

> [H]e is no longer a representative of the association.

By natural and rational implication, the language in the affidavit illustrates that Liggett was once a representative of TABA.

A principal is bound by the acts of his agent within his apparent or ostensible authority. *McCoy v. Willis*, 177 Tenn. 36, 145 S.W.2d 1020 (1940).

The admitted act of furnishing Liggett with the forms of receipt quoted above, is sufficient material evidence that Liggett was authorized by defendant to certify on behalf of defendant the authenticity of the semen utilized in the artificial insemination. The falsity of this certification is the foundation of the present suit.

The admissions of the defendant, quoted above, are confirmation of this authority and resultant liability of defendant.

7

Even if an agent's tortious act be outside his express authority, the principal may be estopped to assert lack of actual authority. *Adams v. Duncan Transfer and Storage*, 757 S.W.2d 336 (Tenn. Ct. App. 1988).

Apparent or ostensible authority results when a principal knowingly or negligently permits an agent to exercise certain authority in his behalf or knowingly or negligently holds the agent out as possessing certain authority to act for the principal, notwithstanding such authority was never actually granted. *Oppenheimer v. Wooline*, 4 Tenn.Civ.App. 134 (1834). *See also Southern Railway Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675 (1917) and Am.Jur.2d Agency, §§ 19 and 80 (1986).

There is material evidence to support the finding of the jury that TABA was liable to both England and Whitley for the fraudulent conduct of Liggett.

## EVIDENCE OF ENGLAND'S DAMAGES

TABA asserts that the evidence of the damages of England are too speculative to support the jury's verdict. We agree.

Dr. Dunham's testimony concerning England's damages was based upon incomplete information. He testified that he based his damage calculations upon the amount of potential milk production loss that would have existed for each individual that was sired. However, it was not until the morning of trial that Dr. Dunham was made aware that England had been using the services of another breeding technician to sire his cows. This technician was Roger Toombs.

In calculating England's damages, Dr. Dunham reviewed England's Dairy Herd Improvement Association ("DHIA") records "quite extensively." However, these DHIA records reveal an inability to identify the sires used to inseminate England's heifers. The DHIA records contained a section entitled "Percent Cows With Sire ID." These percentages represent the proportion of animals in the herd for which the sire is recorded

in the DHIA system. In 1981, 59% of England's first calf heifers could be identified with their respective sires. In 1984, this number dwindled to 8%, and thereafter to 5% by 1985. As mentioned above, Dr. Dunham relied heavily upon England's sire identification to calculate loss of milk production. This sire identification information, however, was scant at best and hardly sufficient to establish reasonable damages.

Along these lines, TABA's expert, Dr. Bennett Cassell, testified that it would be very difficult to calculate milk production loss without knowing the identity of the specific cattle bred with the inferior semen.

> Q. All right, sir, in evaluating and calculating damages in a dairy genetics case, is it correct that you have to study the individual cows as opposed to the herd?
>
> A. I don't see a way to measure the damages other than on an individual cow basis. Yes, you would have to study individual cows.
>
> Q. So sir, if you are unable to identify the specific cattle, is it possible to do these calculations on milk production losses?
>
> A. On an individual cow it would be difficult unless you could refer back to some piece of evidence that convinced you that that cow resulted from a service performed by a known individual.
>
> Q. You have to know the sire identity to be able to track it?
>
> A. You would need to know the sire identity.

At trial, counsel for TABA had entered into evidence a chart illustrating that England paid approximately $9,954 in breeding fees to the Giles Artificial Breeding Association ("GABA") (the name placed on the checks for services provided by Liggett) and $8,038 to Roger Toombs thereby evincing that 55% of breeding fees were paid to GABA and 45% to Toombs. When asked if he could testify what percentage of England's cows were bred with the inferior semen, Dr. Dunham stated:

> Not at this point. All I can do is just guess from the amount that was spent on breeding fees. And I said that breeding fees may have been different from one person to the next. I can't today.

Later in Dr. Dunham's testimony, counsel for England attempted to have Dr. Dunham adjust his previous calculations by applying the 55% breeding fee figure.

Q. If what Mr. Jones just asked you, if you applied the 55 percent figure --

A. Yes, sir.

Q. From 16 (exhibit), would you simply multiply by 55?

MR. JONES: Object, Your Honor, please, that is speculation.

MR DOUGHTY: I'm asking how he would do the calculation assuming this number is correct, Your Honor.

THE COURT: Assuming the check numbers to be correct?

MR. DOUGHTY: Yes, Your Honor, he already questioned about those check numbers and the dollar amount. I'm asking him the percentage --

MR. JONES: Your Honor, please, there is no proof in the records about Toombs fees.

THE COURT: That is the problem. We don't know who is charging what fees or for that matter what semen. Sustain the objection.

Where damages are by their nature not susceptible to exact proof, it is only necessary for the plaintiff to lay a foundation to enable the jury to make a fair and reasonable assessment of the damages. *Pinson Ins. Agency v. Kneal*, 800 S.W.2d 486 (Tenn. Ct. App. 1990); *Wilson v. Farmer's Chemical Assn.*, 444 S.W.2d 185 (Tenn. Ct. App. 1985). Neither exact computation nor mathematical certainty is required in proof of damages. *Provident Life & Acc.'t Ins. Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 3 S.W.2d 1057 (1928); *Cummins v. Brodie*, 667 S.W.2d 759 (Tenn. Ct. App. 1983). Only a reasonable degree of certainty is required. *Redbud Co-op Corp. v. Clayton*, 700 S.W.2d 551(Tenn. Ct. App. 1985).

In light of the scarcity of sire identifications and in light of the testimony of both Drs. Dunham and Cassell as to the need for such identifications in assessing lost milk production damages, we are of the opinion that the verdict is not supported by competent and material evidence in order to lay a sufficient foundation to enable the jury to make a fair and reasonable assessment of the damages.

Accordingly, we reverse the judgment of the trial court affirming the jury's award of

damages to England in the amount of $77,840.54 and prejudgment interest of 8%, and remand the issue to the trial court for further determination.

## EVIDENCE OF WHITLEY'S DAMAGES

TABA contends that Whitley's calculations concerning his damages were premised upon unsubstantiated assumptions and speculations. Particularly, TABA insists that Whitley failed to provide a "reasoned analysis" for his damages. We disagree.

In a case such as this, some level of speculation is to be expected. The fraudulent conduct of Liggett is recognized as having been deliberate. The repercussions of his actions were only known to the parties of this matter after the fact. Consequently, this case is necessarily fraught with difficulties in determining a measure of damages. Undoubtedly, however, damages do exist. The fact of damages is not speculative. Only the manner in which these damages can be illustrated is subject to any speculation. But such speculation is necessitated by the factual scenario in this matter.

Whitley testified as a man who has been involved in dairy farming his entire life. When Whitley discovered that some of his cows had been inseminated with inferior semen, he culled out the cattle inseminated by Liggett, which numbered forty-three, and sold thirty-seven of these cows at a much lower price. In this Court's opinion, this is the only course of action that Whitley could have taken which would not in reality increase rather than decrease his damages. He sold the inferior cattle and bought back what he could from the money obtained from the sale. If he had kept the inferior cattle, perhaps his losses would have been greater.

Contrary to what TABA insists, it is the opinion of this Court that the damage analysis of Whitley was a "reasoned analysis." As mentioned *supra*, Whitley was able to determine that Liggett had bred forty-three of his cows by utilizing the charts Liggett filled out each time he inseminated cows for Whitley. Of these forty-three cows, Whitley sold thirty-seven of them receiving a sale price of $15,313.00. Had the cattle been correctly

11

bred and their ancestry properly fixed, Whitley testified that they would have sold for approximately $1,300 to $1,500 per cow. With the funds he received from the sale of the inferior cows, Whitley testified that he would have been able to purchase only twenty to twenty-two replacement cows. This is fifteen fewer cows than Whitley should have had if the cattle had been bred absent the fraudulent conduct of Liggett.

Using the "bull books" distributed by TABA, Whitley testified that the cattle, if bred correctly as he had ordered, should have produced nine hundred to one thousand pounds of additional milk over their ancestors. The cattle bred by Liggett would have come on line in 1990. He further testified that over the lifetime of a heifer, she will produce three offspring. In calculating his damages, Whitley took into account that one half of those offspring would be heifers. Also accounted for in calculating damages were the deaths of cows in his herd. Whitley used figures in his calculations that were lower than the herd averages for the state as well as lower than normal appraisal rates on these animals.

Utilizing these figures, Whitley testified that the lost milk production because of the absence of the fifteen cows would have been as follows:

| First year: | $12,542 |
| Second year: | $13,625 |
| Third year: | $13,135 |
| Fourth year: | $16,361 |
| Fifth year: | $18,531 |
| Sixth year: | $21,505 |
| Seventh year: | $23,813 |
| TOTAL: | $119,512 |

Whitley testified that the increase in the dollar amounts each year is due the increase in cows as they replenish each year.

In addition to these figures, Whitley testified that he had two bulls that were derived from Liggett's inferior insemination. He sold these two bulls for a total of $300. Whitley further testified that the bulls would have been worth $3,000 if they had been bred properly. This added $2,700 to his calculated damages.

Furthermore, Whitley testified that the year after initially selling thirty-seven of the

12

cows inseminated by Liggett, he sold the remaining six cows for $500 apiece. He insists that the value of these cows, if bred correctly, would have been approximately $1,300 per cow for a total of $7,800. Therefore, Whitley appends this $4,800 difference to his damages.

Finally, Whitley testified that he would have twenty-six mature cows, eleven spring heifers, and eleven younger cows to cull out. Whitley affixed a value of $1,300 to each of the twenty-six mature cows and eleven spring heifers for a total of $48,100. Whitley affixed a value of $750 to each of the eleven younger cows for a total of $8,250. The total for all "culling out" sales, according to Whitley's estimation, amounted to $56,350.

When adding these figures to Whitley's $119,512 estimated loss of milk production, the grand total of Whitley's calculated damages was $183,362. The trial court was of the opinion that these damages were excessive, and consequently, granted a new trial to TABA unless Whitley accepted a remittitur on his damages not in excess of $120,000.

In 1911, the Tennessee Legislature enacted what is now Tenn. Code Ann. § 20-10-102 concerning remittitur. In 1969 an additur statute was enacted--Tenn. Code Ann. § 20-10-101. The purpose of these acts was to allow trial and appellate courts to revise and correct errors relating to the size of a jury's verdict. The statutes recognize the inherent power of trial courts to "suggest" an additur or remittitur as an alternative to a new trial. The Supreme Court has held that a jury verdict found to be excessive may be cured by remittitur. *Poole v. Kroger Co.*, 604 S.W.2d 52 (Tenn.1980). Courts are encouraged to exercise caution in ordering a new trial based on the size of a jury verdict and should, if at all possible, utilize the remedy of remittitur. *Pitts v. Exxon Corp.*, 596 S.W.2d 830 (Tenn.1980); *Jenkins v. Commodore Corporation Southern*, 584 S.W.2d 773 (Tenn.1979); *Guess v. Maury*, 726 S.W.2d 906 (Tenn.App.1986).

The Supreme Court outlined its views on the impact of the trial judge's decision in evaluating the excessiveness of a jury verdict over a century ago. In *Tennessee Coal &*

13

*R.R. v. Roddy*, 85 Tenn. 400, 5 S.W. 286 (1887), the trial judge stated that he felt the judgment was excessive, but, nevertheless, sustained it "to terminate the litigation in this case, ... this Court having tried the case for the third time." *Id.* at 402, 5 S.W. at 287. The Supreme Court refused to set aside the judgment on appeal, holding that it was the responsibility of the trial judge to do so if he thought it proper. It stated: "Much of the importance and weight attached to jury trials proceeds from the presumption that an intelligent and learned Circuit Judge, accustomed to weighing evidence, has scrutinized the proof, looked into the faces of the witnesses, and indorsed the action of the jury." *Id.* at 403, 5 S.W. at 288.

This same philosophy continued after remittitur had become recognized as a method of curing excessive verdicts as an alternative to a new trial. In *Wolfe v. Vaughn*, 177 Tenn. 678, 688, 152 S.W.2d 631, 635 (1941), the Supreme Court stated that the "amount fixed by the jury and concurred in by the trial judge will be accepted upon appeal unless there is something to show a violation of the discretion" of the trial judge. The Supreme Court has further stated that a jury verdict which has the trial judge's approval is entitled to "great weight," *D.M. Rose & Co. v. Snyder*, 185 Tenn. 499, 525, 206 S.W.2d 897, 908 (1947), and that the appellate court "rarely ever" disapproves damages set in this manner. *McClard v. Reid*, 190 Tenn. 337, 343, 229 S.W.2d 505, 507 (1950). The Supreme Court again emphasized the responsibility of the trial judge in determining whether the amount fixed by a jury is excessive: "After he has approved the verdict it is our duty not to disturb it unless it is evident that he failed to keep the jury within reasonable bounds."

More recently the legislature has laid to rest any question about the standard of review in the Court of Appeals on additur or remittitur by enactment of Ch. 232 of the Public Acts of 1987, Tenn. Code Ann. §§ 20-10-101(b)(2) and 20-10-102(b) to provide that Tenn. R. App. P. 13(d) shall apply. Tenn. R. App. P. 13(d) mandates in pertinent part:

> (d) Findings of Fact in Civil Actions.--Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the

14

> finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.

The courts are in agreement upon a primary guideline relevant to the issue of damages. In *Reeves v. Catignani*, 157 Tenn. 173, 7 S.W.2d 38 (1928), this Court said:

> The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence. 157 Tenn. at 176, 7 S.W.2d at 36.

In our evaluation of the case before us, we find that there was sufficient proof of Whitley's damages presented to the jury on which they could base their award. Recognizing that it is the jury's special province to evaluate damages and that damages often cannot be defined with "mathematical precision," we do not find the award to be excessive, but rather that it stemmed legitimately and naturally from the regrettable facts of this case. After a *de novo* review on the record, we find that the jury's verdict conformed to the requirements of Tenn. R. App. P. 13(d), and therefore we reinstate the original award of $183,362.

## CONSUMER PROTECTION ACT

Whitley and England insist that TABA should be held liable for Liggett's fraudulent conduct under the Tennessee Consumer Protection Act. They further insist that the principles of agency should be made applicable to the Act in so holding TABA liable. We agree.

Five days before the trial on this matter, plaintiffs filed a motion with the court in an attempt to amend their complaint. In their attempt at amending the complaint, England and Whitley desired to state more specifically what sections of the Tennessee Consumer Protection Act they believed TABA had violated. The trial court denied their motion to amend and the trial proceeded as scheduled.

England and Whitley's original complaint contained a cause of action under the Tennessee Consumer Protection Act. Specifically, it stated:

> 16. The actions alleged hereinabove constitute unfair or deceptive acts or practices affecting the conduct of trade or commerce in violations of the Tennessee Consumer Protection Act of 1977. (Tenn. Code Ann. § 47-18-104[a]).
>
> 17. The plaintiffs and each of them are "consumers" within the meaning of the Tennessee Consumer Protection Act of 1977.
>
> 18. The actions alleged hereinabove are also violations of Tenn. Code Ann. § 47-18-104(b)(7) of the Tennessee Consumer Protection Act of 1977 as representations that goods or services are of a particular standard, quality or grade when they were actually of another.

The record fails to disclose that England and Whitley, in accusing TABA, relied upon any specific provisions of the Tennessee Consumer Protection Act besides sections (a) and (b)(7). Tenn. Code Ann. § 47-18-104(a) of the Act provides that "unfair or deceptive acts or practices affecting the conduct of any trade or commerce are hereby declared unlawful." In any event, it is the opinion of this Court that the jury could have found TABA liable for Liggett's deceptive trade practices under agency principles.

Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency. *Kelly v. Cliff Pettit Motors*, 191 Tenn. 390, 234 S.W.2d 822 (1950). Generally, to prove apparent agency one must establish (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *Oppenheimer v. Wooline*, 4 Tenn.Civ.App. 134 (1834). *See also Southern Railway Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675 (1917) and Am.Jur.2d Agency, §§ 19 and 80 (1986).

First, there is sufficient proof in the record to support the finding that TABA negligently acquiesced in Liggett's exercise of authority in inseminating cows. Indeed,

TABA allowed its name to be placed on the breeding receipts. TABA's general manager admitted by negative inference that Liggett was a representative of TABA when he stated that Liggett was "no longer a representative of the Association." Furthermore, TABA provided "bull books" whereby cattle farmers chose what type of bull semen with which to inseminate their heifers.

Second, both England and Whitley testified that they believed that TABA and Liggett were one and the same. Specifically, England testified as follows:

> Q. To what extent, if any, did you believe T.A.B.A. had any backing of Mr. Liggett?
>
> A. Well, they was all one in my opinion.
>
> Q. And what did the appearance of their name on this breeding receipt signify to you?
>
> A. That he was an agent of them.
>
> Q. And did that give you any comfort in your belief that based on this receipt, that he was an agent of T.A.B.A.?
>
> A. Yes, because I have their bull books and all and I knew what their semen was doing.

Whtiley testified similarly:

> Q. During this period of time that you were using artificial insemination on your dairy herd, from whom were you buying bull semen?
>
> A. Select Sires.
>
> Q. And what is Select Sires and T.A.B.A., can you tell the jury?
>
> A. To me Select Sires and T.A.B.A. is just one giant organization, that is the way I always understood it. It is a place that you would purchase semen from the bulls that you wanted to use to breed your cows. And T.A.B.A. was the State organization and I understood the Ohio based placed to be the National part and then you had county brances under that. I lived in Maury County. Mr. Liggett, he was a Giles County technician. Mr. Sam Kirk and Roger Toombs was Maury County Technicians.
>
> Q. For?
>
> A. Tennessee Artificial Breeding Association.

Finally, England and Whitley relied upon this apparent authority of Liggett to their

17

detriment. Testimony was given on behalf of both England and Whitley elaborating on the extent of their damages.

Tenn. Code Ann. § 47-18-109(a)(1) and (e)(1) allow plaintiffs who filed suit under the Act to recover actual damages and reasonable attorney's fees.

We see no logical reason why agency principles should not be applied to the Tennessee Consumer Protection Act.

**CONCLUSION**

In light of the foregoing, we reverse the judgment of the trial court granting TABA's motion for directed verdict and dismissing plaintiffs' Tennessee Consumer Protection Act claim and remand this matter to the trial court for further proceedings necessary and consistent with this opinion. Further, we reverse the judgment of the trial court affirming the jury's verdict awarding England $77,840.54 and 8% prejudgment interest and remand this matter to the trial court for further determination of damages and attorney's fees to award to England, if any, under the Tennessee Consumer Protection Act. Further, we reinstate the jury's verdict awarding Whitley $183,362.00 and remand to the trial court for a further determination of the amount of attorney's fees to award to Whitley, if any, under the Tennessee Consumer Protection Act. Costs are adjudged equally against England and TABA for which execution may issue if necessary.

                                 _____

                                 HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

18

LILLARD, J.